James Alfred **RUTLEDGE** et al.

v.

**STATE OF LOUISIANA** et al.

Civ. A. No. 15773.

United States District Court,
W. D. Louisiana,
Monroe Division.

Aug. 11, 1971.

John S. C. Massey, Massey & Robinson, West Monroe, La., for plaintiffs.

George M. Snellings, Jr., McHenry, Snellings, Breard, Sartor & Shafto, William G. Kelly, Jr., Davenport, Files & Kelly, Haynes L. Harkey, Jr., Hayes, Harkey, Smith & Cascio, Robert W. Kostelka, Dist. Atty., and John R. Harrison, Asst. Dist. Atty., Monroe, La., for defendants.

George M. Snellings, Jr., McHenry, Snellings, Breard, Sartor & Shafto, Wil-

liam G. Kelly, Jr., Davenport, Files & Kelly, Monroe, La., for intervenors.

DAWKINS, Chief Judge.

## MEMORANDUM OPINION

### I.

#### *The Issues*

Plaintiffs bring this class action on behalf of residents of Ouachita Parish, Louisiana, residing outside the City of Monroe, claiming that the manner in which members of the Ouachita Parish School Board are elected, as provided by the applicable State statute, as interpreted by the Louisiana Supreme Court, is violative of their rights under the Fourteenth Amendment by denying due process and equal protection of the laws to residents of the Parish residing outside the City. They seek declaratory and injunctive relief. As a practical matter, plaintiffs seek to prevent the residents of the City, which has its own separate school system, from voting in the election of, or from electing members to, the Parish School Board.

This Court previously has dismissed all originally named defendants except certain State officials (who did not move for dismissal) and the Parish School Board (see our Order dated March 4, 1971); and, all relevant facts being stipulated by the parties, ordered briefs on the merits. Subsequently, intervention of the class of residents residing within the City was allowed.

Unhappy with, and disagreeing with, the Louisiana Supreme Court's interpretation of La.R.S. 17:52 (Section 17 of Act No. 100 of 1922), and strongly influenced by Court-ordered reapportionment (in Civil Actions Nos. 12,171 and 11,297—an interim weighted vote plan, which in due course will be finalized into voting districts under 1970 census figures) resulting in School Board members elected from the City being given a majority on the Parish Board, and which will give them a majority in the final plan, plaintiffs now seek relief upon alleged Constitutional grounds.

La.R.S. 17:52 provides in relevant part:

"The membership of each parish school board shall be as follows:

"There shall be elected by the qualified voters of each police jury ward of the several parishes of the state a member of the school board of such parish for each police juror in said ward, whose term of office shall be for a period of six years.

"When the parish school board has no jurisdiction over or control of the public schools *of a city* in such parish, and when the limits of a ward of such parish extend beyond the limits of such city, only that part of the ward outside the limits of the city shall be represented on the parish school board, and shall have only one member of said board, who shall be an elector of the ward living outside the limits of the city, and shall be elected by the voters of the ward living and voting outside the limits of the said city." (Emphasis added.)

In applying that statute to Ouachita Parish and the City of Monroe, the Louisiana Supreme Court concluded:

"Let us suppose that the City of Monroe should relinquish to the Ouachita Parish School Board the ownership, operation and maintenance of all of its schools except one small grade school serving a very few children. According to the theory of plaintiff, even under those circumstances, the people of Monroe would not be entitled to representation on the parish school board because that board would have no jurisdiction over or control of the one remaining school belonging to the City of Monroe. We can not believe that the Legislature contemplated a result of that kind.

"[2] Section 17 of Act No. 100 of 1922 was intended to apply, we think, where a city owns, maintains and operates *exclusively ALL* of the public

schools within its limits *and where the parish school board's activities are restricted to the schools of the parish located OUTSIDE* or beyond those limits. In that situation the parish school board would have no jurisdiction over or control of the public schools of (in) the City in such parish.

"[3] Since the Ouachita Parish School Board has jurisdiction over and control of many of the public schools of (in) the City of Monroe, the disputed language of Section 17 is not applicable here. And it follows logically that the City of Monroe may have representation on such board. * * * " (Emphasis and capitalization added.) Avant v. Ouachita Parish School Board, 215 La. 990, 41 So.2d 854, 859 (1949). See also, McHenry v. Ouachita Parish School Board, 169 La. 646, 125 So. 841 (1929).

Thus we see that the prime question posed by this action is whether the State's highest Court's interpretation of La.R.S. 17:52, as applied to the Ouachita Parish School Board, deprives the residents of Ouachita Parish residing outside the City of due process and equal protection of the laws by allowing the residents of Ouachita Parish residing in Monroe—which has its own School Board and a number of schools within the City —to vote for and elect Parish School Board members.

## II.

### Propriety of Three-Judge Court

The threshold question here is whether this is a proper matter for decision by a three-judge court (which has been convened in this case) under 28 U.S.C. § 2281, et seq. While all parties, in that portion of their briefs directed to this issue, have agreed that this indeed is a proper case for a three-judge court, and we previously have indicated our agreement upon that point, upon further and deeper consideration, we now have serious doubts that the issue should be resolved by a three-judge court. The United States Supreme Court, we think, has summarized appropriate standards applicable to this matter:

" * * * The purpose of § 2281 is 'to prevent a single federal judge from being able to paralyze totally the operation of an entire [State] regulatory scheme * * * by issuance of a broad injunctive order' * * * and to provide 'procedural protection against an improvident state-wide doom by a federal court of a state's legislative policy'. * * *

"The Court has consistently construed the section as authorizing a three-judge court *not merely because a state statute is involved but ONLY when a state statute of general and state-wide application is sought to be enjoined.*" (Emphasis and capitalization added.) Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 1547–1548, 18 L.Ed.2d 643 (1967).

We find the rationale of *Moody* singularly applicable here. Except in Washington Parish located in the southeastern part of the State, in the Eastern District of Louisiana, only Ouachita Parish has a dual City and Parish school system. There is no evidence showing that Washington Parish schools are located within the principal urban area, the City of Bogalusa, as is the situation in Ouachita (a significant distinction in light of the *Avant* decision *supra*). Neither the pleadings, briefs, nor evidence reflect that the situation challenged in Ouachita Parish exists in any of the other sixty-three Parishes. The Louisiana Supreme Court decisions cited above treat the matter as purely local and of no far-reaching state-wide application. Moreover, the Court may take judicial notice that the dual school system here challenged is not of general state-wide use. The challenged statute, as interpreted and applied to Ouachita Parish, therefore, as a practical matter, is not of "general and state-wide application" but is attacked solely as it relates to this one Parish in the State. There is little or no possibility that an injunction against the

system existing in this Parish would have more than purely local impact.

▮ The policy reasons underlying congressional philosophy for convening a three-judge court, as interpreted and enunciated by the Supreme Court as set forth above, simply do not apply here. Declaring the statute as interpreted and applied to be unconstitutional would not at the state level "paralyze totally the operation of an entire regulatory scheme. * * * *" The three-judge court requirement is a technical one and should be narrowly applied. Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 85 L.Ed. 800 (1941).

▮ Accordingly we hold that this is not a proper case for a three-judge court. See also, Sailors v. Board of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967). Cf. Skolnick v. Board of Commissioners, 435 F.2d 361 (7th Cir. 1970); Chavis v. Whitcomb, 305 F.Supp. 1359, 1362 (S.D.Ind.1970), consolidated case, rev. on other grounds, Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971, No. 92). But see, Alabama State Teachers Association v. Alabama Public School and College Authority, 393 U.S. 400, 89 S.Ct. 681, 21 L. Ed.2d 631 (Harlan, Douglas, JJ., dissenting).

The other members of the originally convened three-judge District Court agreeing that this is not a proper case for a three-judge Court has dissolved that Court and relegated the decision of the matter to this Court.

### III.

#### The Merits

Plaintiffs' first ground for attack is that residents of the City of Monroe legislatively are afforded "representation without taxation" upon the Ouachita Board, the converse of that well-known shibboleth used at the "Boston Tea Party" of the American Revolution. They object that under this legislation " * * * although the people residing in the City of Monroe pay *property* taxes for school

purposes only to the City of Monroe, and do not pay any property taxes * * * for the support of the Ouachita Parish School system, [under the challenged statute as interpreted by the Louisiana Supreme Court] they are entitled to elect and have as representatives members of the Parish School Board, which administers the funds [and affairs] of the Ouachita Parish School system."

Plaintiffs further contend that "[a]s far as counsel can ascertain Monroe is the only political district (school or otherwise) which elects representatives from its territorial limits to serve and control a foreign political district."

The fallacy and speciousness of this contention readily is apparent. First, the question of the relationship between the two local governing bodies essentially is one controlled by State law.

"Political subdivisions of States—counties, cities, or whatever—never were and never have been considered as sovereign entities. Rather, they have been traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions. As stated by the Court in Hunter v. City of Pittsburgh, 207 U.S. 161, 178, 28 S.Ct. 40, 46, 52 L. Ed. 151, these governmental units are 'created as convenient agencies for exercising such of the governmental powers of the state as may be entrusted to them,' and the 'number, nature, and duration of the powers conferred upon [them] * * * and the territory over which they shall be exercised rests in the absolute discretion of the state.' * * * *" Reynolds v. Sims, 377 U.S. 533, 575, 84 S.Ct. 1362, 1388, 12 L.Ed.2d 506 (1964).

On the essential facts of this case, and practically, the Ouachita Parish and Monroe school systems clearly cannot be characterized as "foreign" or totally separate and autonomous subdivisions of the State. There are many substantial ties between the two systems, both fiscally and generally. Students residing in the

Monroe portion of Ouachita Parish have the option, upon entering the first grade, to attend either school system. Until this Court entered a "freeze" order in desegregation actions (in Civil Actions Nos. 12,171 and 11,297), requested by both the Parish and City Boards, students were allowed freely to transfer between the two systems. About 15% of the students now living in Monroe elect to go to the Parish School system, due primarily to geographical convenience. Two large schools, Ouachita Parish High School and Ouachita Parish Junior High School, physically are located in the City of Monroe. The "Parish" schools are provided a number of major City services, e. g., utilities (gas, water, and electricity), sewerage, fire and police protection, as well as streets, sidewalks, etc. As parts of the Parish are annexed into the City, the two systems will become even more interrelated.

The contention that there is "representation without taxation"—assuming arguendo constitutional relevance to that argument—also is manifestly incorrect. The sources of revenue derived for its operations by the Ouachita Parish School Board for the school year 1969–70 were:

1. State ................ 61.2%
   (including many State taxes derived from payments by citizens of Monroe which are substantially larger in the aggregate than those paid by non-Monroe residents.)
2. Ouachita Parish ...... 27.6%
3. Federal .............. 9.1%
4. Non-Revenue .......... 2.1%
   100.0%

The largest single source of revenue included under "Parish" revenue is from sales tax collections for support of the schools of both systems. This tax is collected from residents both inside and outside the City of Monroe, as well as from many non-residents of the Parish, by the City Tax Collector. The receipts are distributed on the basis of average daily student attendance in the respec-

tive school systems. While approximately 67% of this tax is collected from within the City of Monroe, 62% is paid to the Ouachita Parish School Board. It is clear from these facts alone that plaintiffs' claim of "representation without taxation"—again implying no constitutional validity to that contention, Cf. Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L. Ed.2d 583 (1969); Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966)—substantially is refuted. It is axiomatic that the manner of distributing State funds in circumstances such as presented here is a State political question, regulated by the Legislature.

The Ouachita Parish—City of Monroe situation is not totally unique in governmental relationships as plaintiffs assert. Under Louisiana's form of government regulation, in a large number of Parishes in Louisiana, a similar result obtains with respect to Parish government. While Parish Police Juries have as their principal function maintenance of non-city services (when an urban area exists in the Parish), residents of the cities are eligible to vote in Police Jury elections and elect representatives to such bodies or governments—even though the Parishes have a city government, or governments, which provide the vast majority of their local governmental services. Again, this distribution of power and authority is essentially a legislative and political question peculiarly within the competence of the State under its Constitution.

While none of the parties has cited a case squarely analogous to this one, we find the United States Second Circuit Court of Appeals has addressed itself to a closely similar situation. In Clark v. Town of Greenburgh, 436 F.2d 770 (2d Cir. 1971), the Court affirmed a District Court ruling refusing to convene a three-judge court. In so doing, it affirmed the lower Court's holding that the constitutional issues raised were "plainly unsubstantial."

The Town of Greenburgh (analogous to Ouachita Parish here) is divided into six incorporated villages and one unincorporated area. The Town is governed by an elected Town Board. The incorporated villages are substantially self-governing subdivisions of the Town. Each is governed by an elected Mayor and Trustees who collectively constitute the Village Board of Trustees, which has authority over village residents only. Town officials are elected in Town-wide elections. Voters of the villages and of the unincorporated areas vote in Town elections. The primary function of the Town officials is to govern the unincorporated area comprising approximately 47% of the Town's residents. In that situation, as here, residents of the larger (inclusive) governmental unit were seeking to prevent residents of the substantially, but not completely, separate internal governmental units from voting in their elections. The arguments presented were almost identical.

In that case, the Court said:

"Those plaintiffs who reside in the unincorporated area attempt to invoke more familiar constitutional theory. They argue that since a state may not dilute their vote by maintaining election districts of unequal population, Reynolds v. Sims, 377 U.S. 533, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1964), a state may not dilute their vote by granting the vote to persons having 'no substantial interest in and deriving no substantial benefit from' the Town government. Defendants, relying on Hadley v. Junior College District, 397 U.S. 50, 90 S.Ct. 791, 25 L. Ed.2d 45 (1970), and Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969), argue that it would be unconstitutional to deny the village residents the vote. We agree with defendants that the village residents must be accorded a vote in the Town elections because they have a sufficient interest in the Town government. The village residents are taxed for about five per cent of the two budgets, and we note that neither set of plaintiffs—but particularly those who claim dilution of their vote—directly attack the Town's *power* to levy that tax. If the Town tax on village residents were greater, their right to vote would be more obvious, but it is clear enough on the basis of the tax now in effect. \* \* \*

" \* \* \* [P]laintiffs have argued the case as though the residents of Buffalo were being allowed to vote in the election of the Town of Greenburgh. We need not decide what consequences or remedies would flow from that egregious improbability. The only voters in the Town elections live there. That the village residents may have less interest in Town elections than the residents of the unincorporated area does not 'dilute' the votes of the latter group; \* \* \*."

■ The principles discussed by the Second Circuit in holding the constitutional issues "plainly unsubstantial," are completely applicable here; and, although we need not hold plaintiffs' contentions "plainly unsubstantial," as that Court did, we deem them to be wholly without merit, and, accordingly, plaintiffs' prayers for declaratory and injunctive relief must be denied.

A proper decree in accordance herewith should be presented after approval as to form by all counsel.