**Paul CANTWELL et al., Plaintiffs,**

v.

**William H. HUDNUT, III, Mayor of Indianapolis, et al., Defendants.**

**Civ. A. No. IP 75–721–C.**

United States District Court,
S. D. Indiana,
Indianapolis Division.

Sept. 9, 1976.

Edward O. DeLaney, of Barnes, Hickam, Pantzer & Boyd and Theodore R. Boehm of Baker & Daniels, Indianapolis, Ind., for plaintiffs.

Harry T. Ice and George B. Gavit, of Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW

### THE COURT FINDS AND CONCLUDES AS FOLLOWS:

STECKLER, Chief Judge.

### I. *The Historical Background*

■ 1. This litigation relates to the constitutionality of the provisions of the "Consolidated First-Class Cities and Counties Act" IC 18–4–1–1 et seq. commonly referred to as "The Uni-Gov Act"[1] dealing with the composition of the "special service district" councils. The pertinent parts of the Act took effect on June 30, 1969 and January 1, 1970. IC 18–4–15–2. Both prior to and after the passage of Uni-Gov the City of Indianapolis was wholly within Marion County, Indiana. The city residents totalled somewhat more than 60% of the population of the county. It was the only "First Class" city in the State. Like most other American cities, however, it was within a County which had powers of its own. Pursuant to the Uni-Gov Act, the then City of Indianapolis was abolished as a separate

1. This action for declaratory and injunctive relief relating to equal protection in local Marion County, Indiana elections was filed on December 16, 1975. Defendants answered on January 13, 1976. Defendants moved to strike portions of the complaint. Plaintiffs then consented on January 20, 1976· to the dismissal without prejudice of such portions of the complaint. On February 2, 1976 plaintiffs answered certain interrogatories clarifying the relief sought. On March 9, 1976 the parties filed a stipulation as to facts which "may be accepted as if the same were established by competent proof upon the trial of this cause" subject to objection on the ground of relevancy. At the oral argument held herein the parties further stipulated that the last sentence of Stipulation No. 20 be amended to reflect that in March 1976 Exhibit Y thereto was approved by the Mayor and became an Ordinance. [References to "Stipulation" are to a stipulation evidenced by all parties to this action.] No objections were made to the facts established by stipulation. No other evidence was presented.

Briefing was completed on May 19, 1976 and oral argument was heard on June 28, 1976.

In addition to all the evidence and the argument the court pursuant to agreement and/or its inherent power took judicial notice of the following:

(a) the acts of the Indiana General Assembly which provided for the government of Marion County, and all units of government within Marion County before Chapter 173 of the Acts of the Indiana General Assembly for the year 1969, and of that act and of all such subsequent acts;

(b) published United States Census Bureau data and material; and

(c) the Municipal Code of the City of Indianapolis; the ordinances, resolutions and minutes of the City-County Council and of the Police Special Service District and the Fire Special Service District.

(d) Its opinion rendered February 3, 1970, in *Bryant, et al v. Whitcomb, et al,* No. IP 69–C–115, and of the final judgment in said cause entered March 6, 1970, and of City-County General Ordinance No. 48, all of which are attached to Plaintiffs' complaint as exhibits in this cause.

entity and merged into the Consolidated City of Indianapolis which consists of the then City together with the rest of Marion County. See IC 18–4–1–3. The other large local units, the City of Beech Grove and the towns of Lawrence and Speedway, were excluded from the consolidation and retained their own separate local governments.[2] The Uni-Gov Act provided for a mayor to be elected county-wide and a city county council of 29 members, 25 from single member districts and 4 to be elected from the county at-large.

2. Uni-Gov did not provide for a complete consolidation of metropolitan government. Although the right to participate in the election of the mayor of Indianapolis was extended to all residents of Marion County, certain other services were left as before. Notable among these were police and fire services which continued to be performed by the Indianapolis police and fire departments for the area that used to be the City and by the Marion County Sheriff and various fire departments for the remainder of the county. The area of the police and fire special service districts could be extended by the City-County Council and some insignificant areas have been added.

3. The Uni-Gov Act specifies two "special service districts" at issue here.[3] The first is the Police Special Service District which was set up with boundaries coterminous with that of the now-dissolved City of Indianapolis. IC 18–4–12–6(b). The Fire Special Service District was set up at the same time and with the same boundaries. IC 18–4–12–34(b). Provision was made for future expansion of the boundaries of these districts. IC 18–4–12–8 and IC 18–4–12–36. Special Service Districts are defined by the act as having the "purpose of providing the property owners therein with a service or services." IC 18–4–1–2(*1*) and 18–4–15.5–1(p). The districts are separate bodies corporate without the power to issue general obligation bonds. IC 18–4–1–2(*1*). These districts provide police and fire service for the area of the former city.

4. The Act sets up a legislative body, or "council", for each special service district. As originally enacted in 1969 it provided that the members were to come from the combined city-county council as follows:

"A 'Special Service District Council' shall be comprised of the members of the City-County Council elected from all those districts which encompass any part of a Special Service District" Acts 1969, ch. 173, § 102(m).

In 1970 this Court entered its judgment in *Bryant v. Whitcomb*, which observed, *inter alia*, that the statute as it read was ambiguous as to whether the at-large members of the city-county council were to sit on the special service district councils. Since their presence would raise serious constitutional issues, the court construed § 102(m) not to permit the at-large council members to sit on the special service district councils. The City-County Council's response to the *Bryant* opinion came in the form of Ordinance No. 48 [Indianapolis Code § 2–84 now repealed].

5. In 1971, after Ordinance 48, § 102(m) was amended by Acts 1971, P.L. 258, § 1, to read as follows:

[18–4–1–2(m)]. A "Special Service District Council" shall be composed of all the members of the City-County Council elected from an electoral district consisting of the entire County, provided sixty per cent [60%] or more of the population in the county is encompassed within the territorial limits of said District. Such council shall also consist of any member of the city-county council elected from a single electoral district under [IC 1971] 18–4–3–6 with fifty per cent [50%] or

---

**2.** Since this Act relates to only one locality and is not of state-wide application there is no need for a three-judge panel. For further background on Uni-Gov and the special service districts at issue here see "Special Service Districts in a City-County Consolidation. Conflict between Metropolitan Reform and 'One-Man One-Vote' in Indianapolis—Marion County." 47 Ind.L.J. 101 (1971).

**3.** No issue is presented here as to other far more limited governmental institutions such as the Solid Waste Special Service District. IC 19–2–14.5–1 *et seq.*

more of its population within the territorial limits of said special service district.

Where the population of a special service district is less than sixty per cent [60%] of the entire county at any time, the members elected from the electoral district consisting of the entire county shall cease to be members of the Special Service District Council. Where the population of a portion of a Special Service District within a single electoral district falls below, or rises above, such fifty per cent [50%], the members shall cease to be, or shall become, respectively, a member of the Special Service District Council. Such Special Service District Council shall also include members who are appointed to fill vacancies in any district from which any Special District Council member was elected.

As a result of the 1971 amendment, the statute clearly provided for the selection of members of the special service district councils by constituencies including substantial numbers of non-residents of the districts.[4] The ambiguity found in *Bryant* was removed.

6. As originally established, the Special Service District Councils had the following powers:

The Special Service District Council of any Special Service District shall, with respect to such District have exclusive power by ordinance to approve its budget and make appropriations and tax levies required to be made under applicable law therefor; and that shall be its sole function. Acts 1969, ch. 173, § 405.

This Court in its opinion in *Bryant* declared the statutory limitations on the authority of the Special Service District Councils over legislation relating solely to the districts unconstitutional on the basis that it diluted the voting rights of the residents of the districts. The possibility of effective control of the districts by the City-County Council was the source of this problem. It was left to the City-County Council to deal with the problem. In Ordinance No. 48 that body set up a procedure allowing the Special Service District Councils legislative control of affairs within their purview and this was incorporated into the judgment in *Bryant.*

7. However § 405 was then amended by 1971, P.L. 258, § 6 to read as follows:

[18–4–4–5]. Special service district council.—The special service district council of any special service district shall, with respect to such district have exclusive power by ordinance to approve its budget and make appropriations and tax levies required to be made under the provisions of this article [18–4–1–1—18–4–24–25]. No special service district council shall have authority to originate or separately to adopt any other ordinance. However any ordinance adopted by the city-county council relating solely or exclusively to a special service district shall be suspended and of no effect until separately approved and concurred in by a majority of a special service district council when, but only when, the Constitution of the United States or the Constitution of the state of Indiana prohibits such ordinance taking effect without such approval.

The effect of this structure is that except for fiscal matters the special service district councils are again able to be controlled by the 29 member city-county council which includes both the four at-large members and nine councilmen from districts outside the special service districts.[5]

8. Thus as of the date of the judgment entry in *Bryant* (March 6, 1970) this Court found no constitutional problems remaining in the structure or functioning of the special service districts and entered judgment for the defendants. As of that moment in time Uni-Gov was a functioning reality with the scope and membership of the Spe-

---

4. Based upon the 1970 census the four at-large councilmen would qualify to serve on the special district councils under IC 18–4–1–2(m) as amended. The 1970 data is all that is currently available.

5. Ordinance No. 48 also responded to the Court's guidance as to the proper method for selection of a Public Safety Director.

cial Service District Councils set by statute and an interpretative ordinance. In the interim since March 6, 1970 this structure was changed by Acts 1971 P.L. 258 as set forth above and by the repeal of Ordinance 2–84. In sum, P.L. 258 did the following: (1) it restored the at-large councilmen to the special service district councils. (P.L. 258 § 1 quoted *supra* at para. 5) and (2) it restricted the functions of these councils, (P.L. 258 § 6, (quoted *supra* at para. 6). The repeal of Ordinance 2–84 in 1976 only served to confirm these effects and constituted an approval of P.L. 258 by the defendants herein. The same repeal leaves the special district councils with only fiscal powers and no effective device to police the use of this power. Neither P.L. 258 nor the repeal of Ordinance 2–84 were shown to be a response to any change in the structure, functioning or area served by the two special service districts at issue. Neither P.L. 258 nor the repeal of Ordinance 2–84 was shown to contribute in any way to the creation or continuation of Uni-Gov. Thus, any Constitutional defects found therein will not be able to be justified by any progress towards metropolitan consolidation. The services at issue were not consolidated in 1969 nor since.

## II. *The Parties*

9. Plaintiffs Cantwell, Howard and Boyd are all citizens of the United States, registered voters in Marion County, Indiana, and residents of the Police and Fire Special Service Districts which are defined in IC 18–4–1–2(*1*) and IC 18–4–15.5–1(p), and as established by IC 18–4–12–6(b) and IC 18–4–12–34(b). Defendant William H. Hudnut, III, is and has been the Mayor of the City of Indianapolis and the Chief Executive Officer of the consolidated government for Indianapolis and Marion County, Indiana, since January 1, 1976. He was elected at the general election held on November 4, 1975, and is the successor to Richard G. Lugar in this action pursuant to F.R.C.P. 25(d). Defendants Tintera, Kimbell, Hart and Brinkman are the four "at-large" members of the Indianapolis-Marion County City-Council elected at the general

election held on November 4, 1975, each of whom represents a district consisting of the entire area of Marion County, pursuant to IC 18–4–3–6. Defendants Hart and Brinkman are successors in this action to former councilmen Roger Brown and John Ruckelshaus pursuant to F.R.C.P. 25(d).

## III. *The Nature of Special Service Districts*

10. There can be no doubt that this case arises in the context of significant governmental units. Defendants have not argued differently. Among the most fundamental and ancient governmental services are police and fire protection.

11. The 1976 budget reveals that the Police and Fire Special Service District budgets including pensions exceeds $50 million of which about $31 million comes from local tax levies. No single item in the combined county-wide budget equals this total. Only the Health and Hospital budget ($47 million) approaches it. Even Welfare ($35 million) and the *combined* budget for Roads and Transportation ($29.5 million) are smaller. The activities of the special districts are broad. By statute the Police and Fire Special Service Districts through the Director of Public Safety control property, purchase supplies, regulate the members of the police and fire forces, and fix compensation for employees. IC 18–4–12–5. The police force enjoys the fullness of the police powers. IC 18–4–12–16. A community relations office is a functional part of the police force. IC 18–4–12–28. Police and fire officers are provided with insurance and/or educational benefits. IC 18–4–12–30 and 31 and 18–4–12–50. Pension funds are provided. IC 18–4–12–33. In sum, the constitutional questions raised by the structuring of elections for and powers of the special service districts arise in the context of municipal corporations which are large in size and pervasive in activity. These constitutional problems are not temporary. Despite the statutory provisions for the expansion of the special districts and their absorption by the consolidated

government there has been no substantial change in the boundaries of the districts.

12. The Act as amended ties the special service districts into the county-wide administrative structure. Thus, (1) the Police and Fire Special Service Districts are under the authority of the Department of Public Safety, IC 18–4–12–1 et seq. (2) The same department is responsible for weights and measures, civil defense and the dog pound. IC 18–4–12–2. (3) The mayor appoints a Director of Public Safety subject to approval by a majority of the entire City-County Council. IC 18–4–3–4. (4) The budgets for the districts are prepared by the Director. IC 18–4–12–11 and 18–4–12–37. (5) Upon the approval or modification thereof by the special councils, the budget is subject to a veto by the mayor of the consolidated city-county (IC 18–4–5–2(c)) who is elected by the voters of the entire county, not just the special service districts (IC 18–4–3–1). (6) Beyond the limited legislative powers of the districts, their legislative affairs are controlled by the entire City-County Council including both the at-large councilmen as well as single-district councilmen from outside the districts.

13. Within Marion County there are 49 tax rates applied to 83 different geographical areas. No property taxes are (or could lawfully be) collected by the special service districts on property located outside these districts.

## IV. *The Department of Public Safety and Its Relation to the Special Service Districts*

14. One of Uni-Gov's several executive departments is known as the "Department of Public Safety." The present Director of Public Safety is Murrill E. Lowry who has occupied that office since May 20, 1974. Lowry was appointed by Mayor William H. Hudnut, III for a one year term in January, 1976. The appointment was approved by the City-County Council. The at-large members have consistently participated in the voting on the subject of confirmation of the Public Safety Director by the Special Service District Councils since 1969. Cer-

tain minimal activities of the Department of Public Safety extend beyond the area of the Special Service Districts. That is to be expected since the Uni-Gov Act gives that *Department*, as opposed to the Special Districts, certain limited county-wide powers. See IC 18–4–12–2. The *Districts* however have no right to serve non-residents unless statutorily allowed. IC 18–4–3–13. There was no showing of the existence *or* use of any such authority (if there be such) with the possible exception of the reference to contracts to provide fire service to non-resident properties. (Exhibit X at pp. 5–7). This is specifically permitted by IC 18–4–2–9 and 10. With this minor "exception" of no legal significance the record establishes *only* that (a) the *Department* of Public Safety has certain county-wide functions paid on that basis, (b) that the Department administers the geographically-limited Police and Fire Districts which have *separate* financial structures and (c) that the Department of Public Safety and the Indianapolis Police and Fire Districts cooperate with other police and fire agencies. This cooperation does not constitute anything unusual and is typical of ordinary governmental interaction. Such cooperation does not approach a merger of district and county services. Since 1971 the districts have expanded only through marginal annexations of individual *commercial* sites, presumably due to quirks in the Indiana liquor laws. There has been no annexation through the broad population growth allowed by IC 18–4–12–8 and 18–4–12–36. The Special Service Districts, as opposed to the Department, have acted only within their districts. They tax only property located therein.

15. In Indiana voting rights are conferred according to the residence of the voter regardless of place of employment, property ownership or other factors. See Indiana Constitution Article 2, Section 2 and IC 3–1–16–9, 3–1–7–26 and 18–4–3–6. The provisions plaintiffs attack are those permitting all residents of Marion County to vote on the seating of at-large councilmen on the Special Service District Councils.

V. *The Manner of Selecting the Special Service District Council Members*

16. As of the 1970 census, 60.8% of the population of Marion County was located within the boundaries of the Police and Fire Special Service Districts. At no time since has the percentage of residents of the county within these districts exceeded that percentage.

17. The vote in the November 4, 1975 election within and without the Police Special Service District and the Fire Special Service District for councilmen-at-large for terms commencing January 2, 1976, was:

(a) Votes within the county as a whole:

| | Vote | % | | Vote | % |
|----------|---------|------|----------|---------|------|
| Beatty | 111,946 | 48.3 | Brinkman | 119,970 | 51.7 |
| Benedict | 112,704 | 48.6 | Hart | 119,264 | 51.4 |
| Bryant | 112,576 | 48.5 | Kimbell | 119,575 | 51.5 |
| Mahern | 112,697 | 48.8 | Tintera | 118,100 | 51.2 |

(b) Votes within the Fire Special Service District:

| | Vote | % | | Vote | % |
|----------|--------|------|----------|--------|------|
| Beatty | 69,387 | 58.7 | Brinkman | 48,787 | 41.3 |
| Benedict | 69,380 | 58.8 | Hart | 48,564 | 41.2 |
| Bryant | 69,898 | 59.0 | Kimbell | 48,603 | 41.0 |
| Mahern | 69,892 | 59.2 | Tintera | 48,082 | 40.8 |

(c) Votes within the Police Special Service District:

| | Vote | % | | Vote | % |
|----------|--------|------|----------|--------|------|
| Beatty | 70,347 | 58.5 | Brinkman | 49,869 | 41.5 |
| Benedict | 70,818 | 58.8 | Hart | 49,626 | 41.2 |
| Bryant | 70,874 | 58.8 | Kimbell | 49,678 | 41.2 |
| Mahern | 70,886 | 59.0 | Tintera | 49,141 | 41.0 |

Thus while receiving only about 41% of the vote in the Special Service Districts, the four at-large councilmen defendants are given representation in their legislative bodies. The at-large candidates who received over 58% of the vote in the special service districts do not sit by virtue of having lost the other areas of the county by a larger margin than they carried the special service districts.

18. No precise figures were made available, but it was stipulated and the Court finds that the ownership of commercial and industrial businesses, located within the Police and Fire Special Service Districts rests with individuals residing both within and outside of such districts, and within Marion County as well as outside of the county. Also, residents residing both within and outside of the Police and Fire Special Service Districts and within and outside of Marion County hold substantial interests in the form of stock in corporations which have major investments in some of the many businesses located within such districts. In addition, there are many national corporations active in the districts and owning real property therein which have shareholders residing both within and outside of the districts and both within and also outside of Marion County. These corporations own substantial taxable property within the districts. Such business enterprises have employees who live in Marion County, both within and without such Special Service Districts, as well as outside of Marion County. However, stock in such corporations is also held by persons residing outside of Marion County. In sum, persons inside Marion County, but outside the districts hold no relationship to the districts any different from the relationship of persons

living outside Marion County altogether in other parts of Indiana, or even outside Indiana.

19. The calculation of the extent of the dilution involved in the selection of at-large councilmen (if allowed to serve on the special district councils) is relatively simple. At least 39.2% of the county's population lives outside the special service district (Stipulation 7), thus since the franchise is based on residence (IC 18–4–3–6) one concludes that the vote of the average resident, including plaintiffs, suffers a substantial dilution through the votes of non-residents. Plaintiffs contend this is a 39% dilution and clearly impermissible. At oral argument the defendants suggested for the first time that the approximately 40% dilution in the *election* of the at-large councilmen must be reduced by multiplying it by 20% since the at-large make up only 20% (4 of 20) of the membership of the special service district councils. Since 40% × 20% = 8% the dilution thus becomes 8%. This argument has a surface appeal but misses the point. The denial of equal protection here is determined by the dilution of plaintiffs' vote for the at-large councilmen through the vote of non-residents of the district. The extent of the dilution cannot depend upon the size of the legislative body where the at-large sit. A 50% dilution in a Congressional race would not be discounted because the elected Congressman is only one of 435 representatives chosen to serve all the people of this Country. In any event, the practical impact of the dilution is the ultimate test and it is clear that the very sizable vote cast by persons outside the district had the effect of reversing the selections of the residents of the district for their councils.

20. The conclusions expressed in Paragraph 6, *supra* as to the ability of the City-County Council to control the Special Service District Councils is buttressed by a review of the statutory and ordinance provisions relating to the City-County Council

Committees. Each department of the county-wide government has a standing committee with powers as follows:

18–4–3–11. Committees of the council—Internal auditor.—The city-county council shall set up standing committees of not less than three [3] council members for each department, *with full power to investigate the policies and expenditures of the department, with subpoena powers to require attendance before the committees, of employees of the consolidated city, any department thereof or any special taxing district or special service district, and with the right to examine any record or account of the city department or district. . . .* (Emphasis added.)

21. By ordinance the Department of Public Safety has a Standing Committee (Indianapolis Code § 2–76(9)) but since March 1976 the Police and Fire Special Service District Councils have not enjoyed the powers of such a committee which they had enjoyed prior to the repeal of Indianapolis Code § 2–84. The provision of standing committee powers to the Special Service District Councils had been incorporated in the judgment in *Bryant v. Whitcomb* but was repealed by action of the City-County Council as a whole taken during the pendency of this case. This repeal when taken together with IC 18–4–4–5 leaves the Special Service District Councils with little if any power to supervise the Police and Fire Department for which they supposedly serve as legislative bodies.[6]

22. This legislative structure of the Act includes obvious grants of *power* to non-residents of the district since they can control the district through their single-district councilmen as well as through their influence on the at-large councilmen. However, the property outside the district is *not* subject to taxation by the district. Taxation is limited to property solely within the districts. IC 18–4–5–8. Similarly, unless specially provided, the special service districts cannot provide service to non-residents. IC 18–4–3–13. (See also Para. 12 *supra*.)

6. The Ordinances referred to herein are included in Appendix A hereto.

## V. The Constitutional Issues Raised by the Special Service District as Implemented by P.L. 258

23. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1343(3) and (4) and has jurisdiction and venue of this suit since violations of 42 U.S.C. § 1983 and the Equal Protection Clause of the 14th Amendment are established. The Court has power to order relief pursuant to 28 U.S.C. §§ 2201 and 2202 on which this action was brought.

24. At the time of the implementation of Uni-Gov, substantial litigation was directed towards questioning the constitutionality of the Act. See *Dortch v. Lugar* (1971) 255 Ind. 545, 266 N.E.2d 25 and *Bryant v. Whitcomb, supra.*[7] Virtually all of the provisions of the Act withstood judicial scrutiny. However, in *Bryant* the Court noted several constitutional problems raised by the structure of the special service districts. These related to (1) the membership of the special service district councils, (2) the legislative powers of these councils and (3) the method of appointment of the public safety director. The same issues were raised by the plaintiffs herein. In light of the changed factual circumstances discussed herein the Court has decided these issues anew rather than relying on the principle of collateral estoppel.[8]

25. This Court has recognized the need for "flexibility" or "experimentation" in local government. See e. g., *Dusch v. Davis* (1967) 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656; *Sailors v. Board of Education* (1966) 387 U.S. 105, 110–111, 87 S.Ct. 1549, 18 L.Ed.2d 650 and *Avery v. Midland County* (1968) 390 U.S. 474, 485, 88 S.Ct. 1114, 20 L.Ed.2d 45. Such a need can justify a dilution of voting power otherwise impermissible under the Equal Protection Clause.[9] But there is no showing that the legislation at issue here "may reasonably be said to advance the rational state policy" of providing flexibility in local government. See *Mahan v. Howell* (1973) 410 U.S. 315, 328, 93 S.Ct. 979, 987, 35 L.Ed.2d 320.

26. This Court is compelled by *Avery v. Midland County* (1967) 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 and *Hadley v. Junior College District* (1970) 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 to conclude that the units of elected local government at issue here have such "general governmental powers" (*Avery* at 484–5, 88 S.Ct. 1114) to require an apportionment that "does not deprive any voter of his right to have his own vote given as much weight, as far as is practicable, as that of any other voter in the . . . district." *Hadley* at 52, 90 S.Ct. at 793.[10] This result should obtain *a fortiori* when the dilution is in favor of a *non*-resident.

27. That these districts have general governmental powers is obvious when one compares the facts here with those in *Hadley*. Here the powers of the special service district are fully as broad as those in *Hadley*. Police and fire services are normally the very heart of those local governments having "general responsibility". The members of the Special Service District Councils do not have duties "far removed from normal governmental activities" or disproportionately affecting only some citizens. *Ibid.* at 56, 90 S.Ct. at 795. As with education police and fire services have traditionally been governmental functions. *Cf. Salyer* 410 U.S. at 728–729, 93 S.Ct. 1224. See also *Baker v. Regional School District No. 5* (2nd Cir. 1975) 520 F.2d 799, *cert. den.* 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369, where a district far more limited than that in *Hadley* was found to be within the rule of that

---

7. It should be noted that in *Dortch* the Indiana Supreme Court did *not* rule on the issue of "unequal protection" in the context of the special service districts finding such issue to have been waived by appellant there. 255 Ind. at 575–6, 266 N.E.2d at 44.

8. See *Bryant v. Whitcomb*, S.D.Ind., 419 F. Supp. 1290, 1970.

9. There is reason to doubt whether this rationale could ever justify the nearly 40% dilution found here. However, in light of the evidence that issue need not be faced at this time.

10. The holding of *Hadley* is not changed by *Salyer v. Tulare Lake Basin* (1973) 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 which deals with an exception to the rule of *Hadley*.

case. The question of whether participation in voting by *non-residents* constitutes an impermissible "dilution" in violation of the Equal Protection Clause has rarely arisen. There is no reported case other than this one where such unique "representation without taxation" has in fact occurred.

28. The defendants argue in effect that the allowance of the at-large councilmen on the special district councils can be justified on a property-based franchise theory. This ignores the fact that the Constitution of the State of Indiana, Article 2, Section 2, specifically ties the right to vote to residence only, not property ownership or use of services. The qualifications for voting in municipal elections are limited to those set up by the Constitution and the general election laws. IC 3–1–16–9. These latter are similarly limited to residence. IC 3–1–7–26. Under the Uni-Gov Act it is this system of election which is provided. IC 18–4–3–6. At least in Indiana, defendants' discussion of other factors is irrelevant. The statute makes residence, not property or other interests, the test; the issue is whether residence in Marion County outside the district is a permissible selection.

29. Defendants assert that *Glisson v. Mayor and Councilmen of the Town of Savannah Beach*, (5th Cir. 1965) 346 F.2d 135 is "in point". That case legitimized the use of a complicated franchise based under the statute on *residence and/or property* ownership. The Fifth Circuit approved this franchise in the context of a resort community which allows the vote to permanent residents of that city *and* to residents of the county where the city is located *if* they own property in the city.[11] There is no such two-tiered franchise here. Voting for at-large councilmen here is based solely on residence *anywhere* in the county. IC 18–4–3–6. This franchise does not require that any voter live in the special service dis-

tricts, work therein or own property therein. It does not deal with these questions at all. Thus, many of the voters in question here would not meet either of the tests approved in *Glisson*. In *Glisson* there was a "fit" between the franchise granted by the statute and the interests sought to be represented.[12] Here there is no such fit as to the theory defendants assert.

30. Defendants' also rely on *Clark v. Town of Greenburgh* (2d Cir. 1971) 436 F.2d 770. The "outsiders" there both paid *some* taxes and received *some* services from the governmental body at issue. 436 F.2d at 772. Here *by statute* the property of non-residents of the special service districts located outside the district cannot be taxed by the districts (IC 18–4–5–8) and the districts cannot provide services outside the districts except as provided by statute. IC 18–4–3–13. Even if services are provided to "outside" parts of Marion County by contract, they cannot be a basis for granting votes to broad numbers of other non-residents of the district. Moreover, to permit contracts to require the Courts to hold otherwise would be to induce a nation-wide rejection of inter-government cooperation for fear that it would permit, or require, a change in the franchise. It is this Indiana statutory arrangement that is before the Court, as it was in *Bryant*. The New York structure is so different as to be irrelevant.

31. *Rutledge v. State of Louisiana* (W.D. La.1971) 330 F.Supp. 336 is similarly distinguished on the issues of services and taxes. There students from the city could attend city or parish schools. Here, police and fire services are geographically limited. There, the chief source of local revenue was local sales taxes apparently collected from the whole area of the parish. Here the main local revenue comes from property solely within the district. None comes from prop-

---

11. The rights of property owners who lived outside the county were not adjudicated because of a standing problem. *Oliver v. Mayor et al.*, (5th Cir. 1965) 346 F.2d 133.

12. The extent of the fit was shown by evidence in that case indicating that 64% of the value of the real estate in the city was owned by non-

residents of the city and that a "substantial majority" of the non-residents resided at Savannah Beach for one to four months a year. There is no such proof here, nor does it appear that there is much of a useful analogy between a beach resort and an urbanized state capital.

erty without the district, and none comes from Marion County outside the district as such, *i. e.,* as distinguished from any other part of the state outside the district. The other major sources of revenue are federal revenue sharing and Criminal Justice Revenues. Stip. Ex. I.(2), H.(2). The case is not controlling in any way.

■ 32. The defendants made much of the non-local source of some district funds. This Court cannot conclude that because federal revenue sharing comes from all over the United States certain residents of Marion County get a vote for members of the Special Service District Councils. There is again no logical relationship between the franchise granted and the asserted justification.

■ 33. It is the Court's decision that in light of the nature of the electorate which selects the at-large city-county councilmen there is a dilution of at least 39.2% of the vote of the plaintiffs in the selection of these officials if they are allowed to serve on the special service district councils. This is an obvious violation of the Equal Protection Clause and therefore IC 18–4–1–2(m) as amended must be declared unconstitutional pursuant to that Clause and 42 U.S.C. § 1983 since it allows this result unless the defendants have shown that this dilution is "based on legitimate considerations incident to the effectuation of a rational state policy." *Reynolds v. Sims* (1964) 377 U.S. 533 at 579, 84 S.Ct. 1362 at 1391, 12 L.Ed.2d 506 *and* that given such a policy the dilution is within constitutionally tolerable limits. See, *Mahan v. Howell* (1973) 410 U.S. 315, 328, 93 S.Ct. 979, 35 L.Ed.2d 320. Defendants have wholly failed to meet this test.[13]

34. The only two justifications for the dilution suggested by defendants were the need for flexibility to achieve and maintain consolidation and the desire to give non-resident property owners a voice in district affairs. Both theories fail. There is no showing that in 1969, let alone 1971, the provisions for *excluding* police and fire

services from consolidation furthered the effort to get consolidated government. Even if this had been shown there still was no showing as to how this particular method for seating the at-large councilmen on the special district councils was a suitable device designed to aid the flexibility needed to make consolidated government acceptable. Perhaps more obvious is the point that the present system enacted in 1971 *reversed* the structure of a properly constituted council that was the effect of the original Uni-Gov Act as implemented in General Ordinance 48. These 1971 ordinances were not a part of a compromise or general plan and cannot claim any justification in the name of flexibility. Secondly, *this* statutory scheme was plainly not designed to give any representation to those county residents living outside the districts but *owning property* in the district. The franchise portion of the Act speaks only of "residents" (IC 18–4–3–6) and not of property. Defendants' property-based rationale is clearly an after-the-fact effort to justify the result they seek and does not fit with the Indiana constitutional or statutory voting law.

35. As was pointed out in *Mahan v. Howell*, defendants cannot merely assert a rational basis for deviation from Equal Protection. They must go on and show that:

"It can reasonably be said that the state policy urged [by them] to justify the divergences in the legislative reapportionment plan . . . is, indeed, furthered by the plan . . . and whether, if so justified, the divergences are also within tolerable limits." 410 U.S. at 326, 93 S.Ct. at 986.

Defendants have failed to show that this structure obtains any needed flexibility, aids consolidation or gives non-resident *property owners* alone a special voice in district affairs. For all defendants have shown the interests of non-resident property owners who do not live in Marion County have been swallowed in a deluge of voting by Marion County residents from without

---

13. In light of the fact that this Act permits the unique phenomenon of "stranger voting", this Court is tempted to apply the more rigid "strict scrutiny" test but has refrained from doing so in light of defendants' obvious failure to meet even the lesser "rational basis" test.

the districts who own no property therein. This measure has failed to give any impetus to consolidation of the services at issue nor has it been shown to have led to any consolidation of any other service at any time. Thus, the method of selecting the members of the Special Service District Councils is lacking rational justification. Moreover, under no stretch of the imagination does this plan justify a 39.2% dilution. Such a dilution is 50% greater than that disallowed in *Swann v. Adams* (1969) 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501. See *Mahan*, 410 U.S. at 328, 93 S.Ct. 979. In light of the size of this dilution as well as in light of its effect on the makeup of the district councils we must note the Supreme Court's caveat in *Mahan*:

> [a] State's policy urged in justification of disparity in district population, however rational, cannot constitutionally be permitted to emasculate the goal of substantial equality. 410 U.S. at 326, 93 S.Ct. at 986.

To the extent that IC 18–4–1–2(m) allows the at-large councilmen to sit on the Special Service District Councils, it is hereby declared unconstitutional. Appropriate injunctive relief should be entered.

36. The heart of the constitutional wrong just found in IC 18–4–1–2(m) is in its *effect*, not its form. Thus the Court must pay attention to any other device that allows the at-large councilmen an improper say in the affairs of the districts. IC 18–4–4–5 has this effect. It so limits the *legislative* powers of the Special Service District Councils as to make it impossible for them effectively to control the services for which they alone are allowed to approve budgets, appropriations and tax levies. With those three limited exceptions IC 18–4–4–5 throws the legislative powers of the districts into the hands of the entire City-County Council including the four at-large councilmen defendants. This Court views this allocation of control to the at-large councilmen to include the unconstitutional effect of giving power over district affairs to legislators who are elected by an improperly diluted vote. No constitutionally acceptable justification is found. Therefore, it is declared that IC 18–4–4–5 is unconstitutional insofar as it allows the at-large councilmen any control over the affairs of the special service districts in their role as city-county councilmen and insofar as it prevents those councilmen properly representing plaintiffs on said special councils from effectively carrying out their legislative duties. Appropriate injunctive relief should be entered.

37. Plaintiffs have argued this case largely in the context of IC 18–4–1–2(m) dealing with the membership of the Special Service District Councils and IC 18–4–4–5, to the extent it purports to limit the powers of said councils. The Court's views as to the limitations on power as set forth in IC 18–4–4–5 have been presented *supra* in paragraph 36. In addition, the Court has judicially noticed several other statutory provisions dealing with powers of the Special Service District Councils. Several of these statutory provisions are susceptible of construction in conflict with the Court's overall determination as to the proper membership of and powers of the Special Service District Councils. They are discussed separately.

(a) IC 18–4–4–4 refers to the City-County Council as the "primary legislative body" of the consolidated city and county. The same section gives the City-County Council "exclusive power to adopt budgets, to levy taxes or special taxes and to make appropriations required to be made for . . . its special taxing districts . . . ". This provision could be construed to be in conflict with IC 18–4–4–5 giving the Special Service District Councils "exclusive power by ordinance to approve" their budgets, appropriations and tax levies.

(b) IC 18–4–5–5 deals with methods of exercising powers provided by the Act. It notes that "where no method is provided for the exercise of a power or to the extent the method prescribed is incomplete, it may be established by ordinance of the city-county council" subject to certain limitations. This proviso could be read to give the defendants herein when acting together

with the entire City-County Council, residual authority to control or overrule the actions of the Special Service District Councils.

(c) IC 18–4–4–4.5 relates to budget procedures and allows in some instances for the making of additional appropriations or transfers of funds between budgets by the City-County Council. Such proviso could be read in such a fashion as to permit the effective emasculation of the powers properly belonging to the Special Service District Councils.

(d) IC 18–4–3–11 provides *inter alia* that the City-County Council "shall also have the power to establish such other committees with such powers as it shall determine by ordinance." This proviso could be used by defendants in conjunction with the City-County Council in such a fashion as to establish committees conflicting with the powers and responsibility of the Special Service District Councils.

 38. The Court could deal with the potential problems just raised through the device of declaratory judgment. It is clear that "a court may grant declaratory relief even though it chooses not to issue an injunction or mandamus . . . [but] a declaratory judgment can then be used as a predicate to further relief including an injunction." *Powell v. McCormack* (1969), 395 U.S. 486, 499, 89 S.Ct. 1944, 1952, 23 L.Ed.2d 491 (citations omitted). A reading of the four provisions just discussed makes it clear that they are susceptible of interpretation or application in such a manner as to circumvent this court's determinations as to the membership of the Special Service District Councils (IC 18–4–1–2(m) and the powers of said councils (IC 18–4–4–5). No such interpretations or applications have yet been made, however, and accordingly no relief is required at this time. The Court will presume that the defendants intend to act in accordance with the requirements of the Constitution.

39. The necessity for injunctive relief as relates to IC 18–4–4–4, IC 18–4–5–5, IC 18–4–4–4.5 and IC 18–4–3–11 is not clear at this time. This is especially true in light of the fact that the Act does include several safeguards which should lead defendants herein away from any course of conduct which would require injunctive relief. Thus, for example, IC 18–4–5–2(c) provides that as to the Special Service District Councils the defendant mayor may not veto its actions to the extent that they constitute a resolution setting up rules for the internal management of the council, or a "resolution making an appointment provided to be made by the council under applicable law, or selecting the clerks, officers, employees, auditor or independent auditors of the council." In light of this consideration and out of respect for the independence of legislative bodies, this Court will not attempt to define or establish the internal rules for functioning of the Police and Fire Special Service District Councils nor will it attempt to create a specific structure providing for the interaction between these councils and the City-County Council. Rather these legislative bodies are left to work this problem out among themselves consistent with the requirements of the Act as construed by this Court.

40. Plaintiffs' request that the at-large councilmen be excluded from voting on the confirmation of a Public Safety Director is denied on the authority of *Sailors v. Board of Education* (1966) 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650. The Public Safety Director is a nonlegislative officer within the meaning of that case unlike the at-large defendants. The method of his selection, unlike the method of electing the at-large councilmen, may well lead to some consolidation in county-wide affairs, such as Weights and Measures although it leads to no county-wide consolidation of Police and Fire services.

## VI. *Relief*

The appropriate relief is:

(a) Defendants Brinkman, Tintera, Kimbell and Hart and their successors as at-large councilmen should be permanently enjoined from serving or attempting to serve on the Police and Fire Special Service District Councils since IC 18–4–1–2(m) should

be declared unconstitutional to the extent it allows them to so act.

(b) IC 18-4-4-5 should be declared unconstitutional insofar as it improperly limits the powers of the Special Service District Councils by allowing defendants Brinkman, Tintera, Kimbell and Hart and their successors as at-large councilmen control over the affairs of the special service districts within the sphere of action statutorily assigned to such districts. It should also be declared unconstitutional insofar as it assigns said defendants any control over said districts denying to that extent the proper members of said Special Service District Councils the legislative powers necessary to carry out their mandate over the affairs entrusted to said districts. This declaration is not intended in any way to extend the powers of the special service districts beyond those granted in the Act but only to allow the Special District Councils to effectively execute the powers so granted. Defendants Brinkman, Tintera, Kimbell and Hart and their successors as at-large councilmen should be permanently enjoined from using or relying on IC 18-4-4-5 to control the affairs of said Special Service District Councils or to deny the proper members thereof the legislative powers necessary to carry out their mandate under the Act.

(c) Plaintiffs' request that defendants be enjoined from acting to approve the Public Safety Director should be denied.

(d) No relief should be granted as to IC 18-4-4-4, 18-4-5-5, 18-4-4-4.5 and 18-4-3-11.

Judgment to enter accordingly.

### APPENDIX A

#### Sec. 2-76. Standing committees enumerated.

The standing committees of the city-county council shall be as follows:

(1) The administration committee;

(2) The community affairs committee;

(3) The county and townships committee;

(4) The economic development committee;

(5) The metropolitan development committee;

(6) The municipal corporations committee;

(7) The parks and recreation committee;

(8) The public safety and criminal justice committee;

(9) The public works committee;

(10) The transportation committee. (G.O. 293, 1971, § 2 (Rule 3, § 5; G.O. 53, 1975, § 1))

#### Sec. 2-77. Composition and chairmen of standing committees.

The standing committees of the city-county council shall consist of the number of members determined by the committee on committees, but shall not be less than three (3) members and shall have at least one (1) minority member. The president of the city-county council shall name the chairman of each standing committee from among the members named to the committee by the committee on committees. (G.O. 293, 1971, § 2 (Rule 3, § 6))

#### Sec. 2-78. President of the city-county council to be an ex officio member of the standing committees.

The president of the city-county council shall be an ex officio member of each standing committee of the city-county council and may participate in its deliberations. The president shall not vote unless his vote would break a tie, and then only if he chooses to do so. (G.O. 293, 1971, § 2 (Rule 3, § 7))

#### Sec. 2-79. Functions of standing committees.

It shall be the duty of all standing committees of the city-county council to consider all proposals referred to it as provided in these rules. A standing committee may consider any other matter properly concerning departments or subject matter indicated by the name of the standing committee. Meetings of the standing committees shall

be open to the public. A standing committee may hear such testimony or public comment as the committee deems proper. In lieu of separate hearings, standing committees may meet with the boards of corresponding city departments. (G.O. 293, 1971, § 2 (Rule 3, § 9))

### Sec. 2–80. Attendance at meetings of standing committees by city-county council members who are not on the committee.

Any member of the city-county council shall be entitled to attend and participate in the discussions before any standing committee. The councilman introducing any proposal referred to a standing committee shall be a member of that committee while it is considering that proposal, but he shall not be entitled to vote. (G.O. 293, 1971, § 2 (Rule 3, § 9))

### Sec. 2–81. Action and reports on proposals.

Any permanent or standing committee of the city-county council to which a proposal has been referred shall report to the city-county council upon each such proposal within forty-five (45) days of its referral, either with or without a recommendation, unless the president of the city-county council shall withdraw the proposal or reassign it. After any hearing by the committee upon a proposal, the chairman of the committee shall submit a formal report of the committee's action, in writing, to the clerk. The report shall include any recommendations supported by a majority of the committee and may, upon request of any member of the city-county council, include a minority position. Any member of a committee may file a minority report. Such reports shall be filed in sufficient time to permit the clerk to circulate copies to all members of the city-county council prior to the next scheduled meeting of the city-county council. Copies of all committee reports shall remain on file in the clerk's office readily available to the press and public. (G.O. 293, 1971, § 2 (Rule 3, § 10); G.O. 70, 1972, § 1)

### Sec. 2–82. Meetings of standing committees.

Standing committees of the city-county council shall establish at least one (1) regular meeting time and date each month. Other meetings of standing committees shall be held at the call of the committee chairman upon not less than twenty-four (24) hours' actual notice to each member of the committee. All proposals referred to the committees shall be a proper item of business at each regular meeting, unless the proposal has been reported back to the city-county council. At any regular meeting of a committee, three (3) members present shall constitute a quorum for purposes of acting and reporting on any proposal assigned to the committee. (G.O. 293, 1971, § 2 (Rule 3, § 11); G.O. 31, 1975, § 1)

### Sec. 2–83. Special committees.

Special committees of the city-county council may be formed by the president of the city-county council or by a vote of the majority of the members of the city-county council for any specific purpose proper for city-county council consideration. Special committees shall consist of an odd number of members and shall have at least one (1) minority member. (G.O. 293, 1971, § 2 (Rule 3, § 12))

### Sec. 2–84. Police special service district committee and fire special service district committee.

(a) There is hereby created a committee of the city-county council to be known as the "fire special service district committee" and a committee of the city-county council to be known as the "police special service district committee."

(b) Each member of the fire special service district council, as established pursuant to section 310 of chapter 173 of the Acts of 1969, or as shall be established pursuant to section 102(m) of chapter 173 of the Acts of 1969, shall be a member of the fire special service district committee of the city-county council.

(c) Each member of the police special service district council, as established pursuant to section 310 of chapter 173 of the Acts of 1969, or as shall be established pursuant to section 102(m) of chapter 173 of the Acts of 1969, shall be a member of the police special service district committee of the city-county council.

(d) Each committee established by this section shall elect a chairman by majority vote of the committee and shall provide for its organization, procedures and meetings by rules to be adopted by the majority vote of the committee.

(e) Each committee established by this section shall have the authority and power of a standing committee of the city-county council as specified in section 311 of chapter 173 of the Acts of 1969, with regard to matters pertaining solely to their special service districts.

(f) Each committee established pursuant to this section, or a member thereof, shall further have the authority to propose ordinances on all legislative matters relating solely to their respective special service districts. Any ordinance pertaining solely to a special service district shall be acted upon by the city-county council in accordance with its rules, provided that the members of the city-county council who are not members of the committee for the district affected by the ordinance shall not be eligible to debate or vote thereon, and any such ordinance receiving a majority vote of those eligible to vote shall be deemed to be duly passed and adopted.

(g) The appointment of a director of the department of public safety provided for in section 1203 of chapter 173 of the Acts of 1969 shall become effective, and shall be approved by the city-county council, only upon approval of the nominee by a majority vote of the members of the fire and police

special service district committees established in this section. (G.O. 48, 1970, §§ 1–7)

### Sec. 2–85. Investigating committees.

Investigating committees of the city-county council may be formed by resolution of the city-county council for any lawful purpose. The resolution establishing the committee shall specify the membership of the committee, the general nature of its investigation and the power to subpoena witnesses, if the power is granted. (G.O. 293, 1971, § 2 (Rule 3, § 13))

### Secs. 2–86—2–90. Reserved.

### RULE 4. PETITIONS, MEMORIALS, SPECIAL RESOLUTIONS AND COUNCIL RESOLUTIONS *

### Sec. 2–91. Petitions.

Any petition directed to the city-county council, whether specifically authorized by law or not, shall be filed with the clerk and called to the attention of the city-county council by the clerk under the proper order of business. If the petition is one specifically authorized by law, the president shall refer it to a proper committee. As to all other petitions, any motion for referral or other appropriate action shall be in order unless the motion requires action which is proper only by a general resolution or ordinance. In calling the petition to the attention of the city-county council, the clerk need not read the petition in full but shall report, fairly describing its contents. (G.O. 293, 1971, § 2 (Rule 4, § 1))

---

* State law reference—Ordinances and resolutions of the city-county council, IC 1971, 18–4–5–2.