Mason BRYANT et al., Plaintiffs,

v.

Edgar D. WHITCOMB et al., Defendants.

No. IP 69–C–115.

United States District Court,
S. D. Indiana,
Indianapolis Division.

Feb. 3, 1970.

James Manahan, Indianapolis, Ind., for plaintiffs.

Richard C. Johnson, Deputy Atty. Gen., Indianapolis, Ind., for defendants.

OPINION

STECKLER, Chief Judge.

This suit questions the validity of the Indiana statutes providing for municipal government in Indianapolis and Marion County, Indiana, on the basis that these

statutes dilute the voting rights of a cognizable, racial minority in violation of the First, Fourteenth, and Fifteenth Amendments of the United States Constitution. Jurisdiction is founded upon 42 U.S.C. § 1983.

Plaintiff Mason Bryant is a Negro residing within Marion County, Indiana, and is a resident and voter in the Center Township Ghetto Area found to exist within Marion County, Indiana, by the three-judge court in the case of *Chavis v. Whitcomb*, 305 F.Supp. 1364 (S.D.Ind.1969). Much of the same evidence presented to the three-judge court in the *Chavis* action pertaining to that area has been presented in this cause and the findings therein with regard to the Center Township Ghetto Area and the cognizable, racial minority within that area are found to exist in this suit. For the reasons stated in the *Chavis* case, those plaintiffs who are not residents of the Ghetto Area are non-suited in this cause.

The defendants in this action are the Governor of the State of Indiana, the Mayor of the City of Indianapolis, and the members of the majority party of the legislative bodies for local government in Indianapolis and Marion County, Indiana.

The statutes challenged are provisions of Chapter 143 of the Acts of the Indiana General Assembly for the year 1909, and Chapter 173 of the Acts of the Indiana General Assembly for the year 1969, as they relate to electoral districting. The challenge to the 1909 Act is made only to the extent that it might be revived by a judicial declaration that the 1969 Act is unconstitu-

tional. In view of the opinion in this case, it will not be necessary to give consideration to the validity of the 1909 Act.

After a careful analysis of the Act and the federal constitutional questions presented, the Court finds that the Act does contain unconstitutional provisions. However, each of the defects noted can be cured by implementation or other means as pointed out later in this opinion.

The evidence submitted was voluminous and consisted of plaintiffs' Exhibits A to QQ, and defendants' Exhibits 1 through 24, and certain responses of defendants to requests to admit and to interrogatories of plaintiffs. The Court has also taken judicial notice of the United States census figures for the years 1950 and 1960, so far as pertinent, and of all acts of the Indiana General Assembly so far as relevant to Chapter 173 of the Acts of the Indiana General Assembly for the year 1969. Briefs and arguments of counsel have been complete and helpful.

Both the plaintiffs and the defendants rely heavily on the history of the development of local government in Indianapolis and Marion County to support their respective contentions.

Plaintiffs asserted that for over one hundred years the statutes pertaining to local government have been written and rewritten with the primary purpose of vesting near complete control with the then current majority, and with the necessary result of diluting the voting rights, and political power, of identifiable minority groups.[1] They alleged that Chapter 173 of the Acts

---

1. The original councilmanic district ordinance under the present Indiana Constitution was enacted in 1852, and provided that all city councils should be elected from fifteen single-member districts at annual elections. (Acts 1852, Vol. 1, p. 205.) Then, in 1855 a local election was conducted in Indianapolis under fear of rioting by foreign born Germans (Indianapolis Journal, April 25, 1855, p. 11) and the results of the election were lamented in the local press because "the Dutch bunch" elected three representatives to the fifteen single-member district council. (Indianapolis Journal, May 2, 1855, p. 3.) At the next session of the General Assembly a new statute was enacted providing for the

organization of cities which permitted cities to be divided into as few as three councilmanic districts with two councilmen to be chosen from each district at biennial elections for staggered terms of four years, thus diminishing the probability of minority bloc influence. (Acts 1857, p. 44, Secs. 8 and 9.) By 1880 the foreign born constituted slightly more than twenty per cent of the population of Indianapolis (these and subsequent similar figures are from appropriate U. S. Census) and in 1881 the General Assembly enacted a city council statute applicable only to Indianapolis creating an additional councilmanic house of aldermen to be elected from districts three times as large as those

of 1969, popularly known as "Unigov," is simply the latest example of such legislative action by the dominant majority under the guise of municipal reform and metropolitan government. They contended that Unigov makes no major changes in local government other than to extend the voting district for the election of the executive and legislative branches of local government from the existing city limits to the county boundaries. This change confers voting rights on numerous individuals in the middle and upper class suburbs which are nearly all white.[2] The ultimate result, plaintiffs

from which the regular councilmen were to be elected. (Acts 1881, p. 14.) By 1890 persons of Germanic descent included about 27 per cent of the City of Indianapolis, and the following year the General Assembly amended the Indianapolis city council statute eliminating the Board of Aldermen and adding six members to the Council itself to be elected at large. (Acts 1891, pp. 140, 141.) Then, in 1909 the Indianapolis or "First Class City" councilmanic statute was again amended to provide that all members of the council would be elected at large (Acts 1909, p. 341). The bill was introduced by a sponsor who stated that the intendment of the act was that "only the better class of men would be chosen" to serve. (Indianapolis News, February 5, 1909, p. 2, col. 2.) Whatever trend can be discerned from these historical facts must be regarded as largely reversed by the single-member districting feature of the questioned statute. These facts do demonstrate, however, that the problem judicially noted in *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), is neither new nor confined to the emerging Negro voting minority and it is one which will probably persist as long as communities continue to be divided into socio-economic and ethnic enclaves.

2. In addition to alleging the "Ghetto Area" found in *Chavis v. Whitcomb*, the plaintiffs also have alleged a slightly different ghetto area consisting of 1960 United States Census Tracts 220, 501–503, 508, 510–518, 520, 528–531, 534–536, and 540, and have contrasted its statistical profile with that of the outside-Indianapolis-inside Marion County Area that is added to the Indianapolis voting district by the questioned statute.

|  | 1. | 2. | 3. | 4. |
|---|---|---|---|---|
| Robert Kennedy vote, 1968 Presidential Primary | 62.43% | 344.53% | 69.70% | 16.63% |
| Hubert Humphrey vote, 1968 Presidential Election | 73.07% | 173.28% | 60.86% | 25.63% |
| % of Population that is Negro | 71.09% | 467.64% | 5.87% | 1.86% |
| * % of Families below $4000 inc. | 45.00% | 296.44% | 58.98% | 18.37% |
| Portion of dilapidated houses in county | 40.45% | 256.01% | 45.51% | 14.43% |
| Portion of dwelling units built before 1939 in county | 22.44% | 142.02% | 42.48% | 13.46% |
| Portion of workers who use public transportation to go to and from work | 29.12% | 184.30% | 36.57% | 11.55% |
| Portion of unemployed in county | 28.74% | 181.89% | 47.85% | 15.16% |
| ** Portion of college graduates in county | 1.51% | 9.55% | 122.19% | 38.68% |
| Portion of statistical functional illiterates in county | 31.47% | 198.73% | 51.26% | 16.24% |
| * Median family income and proportion to county-wide median | $4,378 | 66.42% | 125.56% | $7,661 |
| ** Median education and proportion to county-wide median | 9.2 yr. | 82.60% | 107.02% | 12.2 yr. |

Column 1 gives the percentage or portion or median figure for the Ghetto Area or the Ghetto Voting Area or the Negro population in Indianapolis, as noted.

Column 2 shows the deviation of the Ghetto of Indianapolis Negro figure from the county-wide figure.

Column 3 gives the deviation of the Marion County Outside Indianapolis figure from the county-wide figure.

alleged, is to dilute substantially the possibility that the cognizable, racial minority in the Center Township Ghetto Area would be able to pursue effectively political action to further their interests.

In essence, plaintiffs contend that the statute is simply a racial gerrymandering of local government boundaries within the meaning of *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and an unconstitutional dilution of voting powers as defined in *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969).

The defendants, however, contend that Unigov is a completely valid, and necessary, legislative effort to reorganize local government to enable it to meet the ever-increasing demands being made upon it; and specifically to consolidate functions of the city and the county and numerous and fragmented elements of local government to create a viable unit for an expanding metropolitan area. Defendants point out that while the boundaries of the City of Indianapolis in the past may have roughly conformed to the urbanized area, they have not in recent years kept up with the expansion of the urbanized area. As a result, a gap has existed between the problems created by urbanization and the ability of government to cope with it in any coordinated and orderly fashion.

Defendants have maintained that the statute does not discriminate against anyone, and in fact gives every resident an equal right to elect governmental officials. Defendants also have contended that the voting rights of no citizen have been curtailed, but on the contrary every citizen in the county has been given a more representative voice in the government as it affects him. They also point out that before the enactment of Chapter 173 citizens living outside the City of Indianapolis were affected in certain functions by determinations of officials of the city who were not elected by them.

The United States Supreme Court has decided that the Fourteenth and Fifteenth Amendments, and the rights protected thereby, are applicable to state legislative actions which alter the boundaries of local units of government or which pertain to the electoral districting of local governmental officials.

*Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), involved the validity of an Alabama statute which made substantial alterations to the boundaries of the City of Tuskegee, Alabama. Petitioners alleged that the sole purpose of that act was to disenfranchise Negro citizens by changing the boundaries in such a manner that all but four or five of the four hundred Negro voters were placed outside the new city boundaries. The principal contention in support of the legislation was that the establishment of local units of government, and the boundaries thereof, was a proper and lawful purpose for a state legislature and not subject to judicial review. The opinion held that if the legislative act was designed to accomplish an unlawful purpose such as alleged by the petitioners, the statute was reviewable to protect the rights guaranteed by the Federal Constitution.

*Avery v. Midland County*, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968), questioned the manner of selection of the Midland County, Texas, Commissioners Court. Midland County had a population of about 70,000. The Commissioners Court was composed of five members—one elected at large from the entire county and the other four from districts whose populations were

Note 2—Continued

Column 4 gives the Marion County Outside Indianapolis percentage or portion figure as *noted*.

(All items except voting figures are based on the 1960 U.S. Census.)

* Figure is given for Negroes in Indianapolis, not Ghetto.

** Four census tracts near predominately white institutions of higher education were abstracted from the Ghetto Area in arriving at the Column 1 figure.

approximately 67,906; 852; 414; and 828. The decision in that case held that such a vast imbalance violated the equal protection clause of the Fourteenth Amendment which was applicable to local units of government.

Justice White, in the majority opinion in *Avery v. Midland County, supra,* however, stated:

"This Court is aware of the immense pressures facing units of local government, and of the greatly varying problems with which they must deal. The Constitution does not require that a uniform straightjacket bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems. Last Term, for example, the Court upheld a procedure for choosing a school board that placed the selection with school boards of component districts even though the component boards had equal votes and served unequal populations. *Sailors v. Board of Education,* 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967). The Court rested on the administrative nature of the area school board's functions and the essentially appointive form of the scheme employed. *In Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967), the Court permitted Virginia Beach to choose its legislative body by a scheme that included at-large voting for candidates, some of whom had to be residents of particular districts, even though the residence districts varied widely in population.

"The *Sailors* and *Dusch* cases demonstrate that the Constitution and this Court are not roadblocks in the path of innovation, experiment, and development among units of local government. We will not bar what Professor Wood has called 'the emergence of a new ideology and structure of public bodies, equipped with new capacities and motivations . . . .' R. Wood, 1400 Governments, at 175 (1961). Our decision today is only that the Constitution imposes one ground rule for the development of arrangements of local government: a requirement that units with general governmental powers over an entire geographic area not be apportioned among single-member districts of substantially unequal population."

The Court notes, although it is not now in issue, that Chapter 173 requires the twenty-five single-member districts to be as nearly equal as practicable in population, and that plaintiffs have not contended that the *Avery* holding is applicable to the facts in this case.

Resolution of the issues presented in this case requires examination of the Indiana statute in the light of the above decisions, and under Article 42, Section 1983 of the United States Code and the First, Fourteenth, and Fifteenth Amendments. Significant provisions of the statute include:

1. Extension of the boundaries of the City of Indianapolis to the Marion County boundaries except for exclusion of three municipalities containing over five thousand inhabitants each.

2. Creation of a single executive-administrative branch for most local government activities within Marion County, with a Mayor elected by all voters in the county.

3. Creation of a single city-county council as the primary legislative body for both city and county government. Twenty-five councilmen will be elected from single-member districts and four councilmen are to be elected by the county voters on an at-large basis.

4. Creation of six departments for the administration of local government. Most, but not all, of the numerous pre-existing governmental agencies and departments will have their functions and authority transferred into one or more of the new departments.

5. Creation of special service districts for certain governmental functions, principally police and fire. These districts will initially have boundaries coterminous with the old City of Indianapolis boundaries, will provide their governmental services only within such territory, and will levy taxes only within such territory.

Provision is made in the Act for expansion of these special service districts as the need for and ability to render the services expands.

6. Creation of special service district councils with authority over budgets, appropriations and tax levies of the respective special service districts.

Plaintiffs have not alleged that the four councilmen-at-large feature of the questioned statute is unconstitutional per se but the firsthand impression similarity which this feature has to the matters considered in the related case of *Chavis v. Whitcomb* compels the Court to consider this possible issue.

The three most identifiable "black" voting wards in Marion County—the 3d, the 6th, and the 23d, returned 80.58% and 83.59% and 81.63% Democratic margins in the 1968 General Assembly election. In the 1964 Presidential Election (which was the only election during the past decade in which the Democrat Party won the county-wide vote in Marion County) all of the wards outside Indianapolis and Center Township returned a very heavy Republican vote while those portions of the former City of Indianapolis which lie inside the contiguous townships of Washington, Lawrence, and Warren and which contained a 1960 population of 141,896 returned a 59.5% Republican vote. The Indianapolis Metropolitan Planning Commission estimates Marion County's present population to be about 806,000. The said contiguous Republican areas inside the former City of Indianapolis would be entitled to four of the twenty-five single-member districts, and these seats, together with the outside seats, would total thirteen or fourteen. Viewing the county voting pattern another way, it is to be noted that the pattern is apparently entrenched for the foreseeable future. In the 1968 General Assembly election the average margin between the two major parties in each ward was such that the typical "victory" of one party over another was a two-to-one "victory." It also can be noted that the pattern presently favors the Republican Party in any single districting plan because

Democrat "ward victories" in that election were by an average margin of 39.5% of the total vote cast while Republican "ward victories" were by an average margin of only 27.8% of the vote cast. When the likely result of an election under "Unigov" is superimposed upon the only county-wide election in which the party which receives the regular bloc voting support of the Ghetto Area received its largest voting support in Marion County during this past decade, it becomes apparent that that party probably would have controlled the "Unigov" city-county council but only because of and not in spite of the four at-large city-county councilmanic seats. It also is apparent from the voting pattern in Marion County that it would be very improbable within the foreseeable future for the party which receives the bloc voting support of the Ghetto Area to win thirteen or fourteen of twenty-five single-member seats without winning county-wide. Plaintiffs conceded in the arguments before the Court that the four members-at-large feature of the questioned statute, presently and in the foreseeable future cannot but help the major party presently receiving the bloc voting support of the Ghetto Area and cannot but hurt the other major party from the standpoint of gaining majority control of the city-county council. Since the four members-at-large feature of the questioned statute cannot in fact dilute the vote of the Ghetto Area, it cannot be construed as having been designed to do so or as being contrary in any way to the dictates of *Fortson v. Dorsey*, 397 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401, 405 (1965).

Two constitutional issues are raised by plaintiffs with regard to the special service districts and their councils. One involves the composition of the councils, and the other the limited authority of those councils over the affairs of the special service districts.

Section 102(m) of the 1969 Act provides:

"(m) A 'Special Service District Council' shall be comprised of the members of the City-County Council elected from all those districts which encompass *any part*

of a Special Service District." [Emphasis added.]

█ The initial question is whether the four at-large councilmen, elected by the voters of the entire county, would be members of the special service district councils, and whether the Act would permit districting so that councilmen with only a small part of their districts in a special service district would serve on such councils. The section of the statute quoted above is ambiguous on the at-large councilmen. The district for the at-large councilmen is the county as a whole, which would encompass the *entire* special service districts. However, the statute specifies that only those councilmen whose districts encompass "*any part*" of a special service district shall be entitled to sit on the council. Construction of the statute to allow the at-large councilmen to sit on the special service district councils would raise serious constitutional issues since approximately forty percent of the voters for such councilmen will reside outside of the special service districts. It is well-established that, if at all possible, courts should construe legislation in such a manner that it meets constitutional standards and should not place a construction on a statute that would impute to a legislative body an intent to enact legislation contravening constitutional principles.

█ Accordingly, the statute is construed to exclude membership on the special service district councils of the four at-large councilmen. So constructed, it is constitutional in this aspect.

With regard to the districting aspect of the composition issue, Section 308 of the 1969 Act provides in part:

"The twenty-five (25) single member Council electoral districts provided in Section 306 shall have the following characteristics:

"(1) Be as equal as practicable in population.

"(2) Be compact in configuration, subject only to natural boundary lines, such as railroads, interstate highways, other major highways, rivers, creeks, parks and major industrial complexes and to the requirement, where practicable, of being located entirely outside or entirely inside a Special Service District."

The Court believes there should be no difficulty in drawing districts consistent with both the above mandate and with the law stated hereinafter in the Court's determination that Unigov is unconstitutional in part. The Court, of course, does not have a specific apportionment plan before it to examine. If the plan drawn does not comply with constitutional standards, an appropriate judicial challenge can be made at that time.

█ However, the difficulty presented by the words "*any part*" which appear in Section 102(m) of the Unigov statute does not relate solely to a hypothetical future drawing of districts. The difficulty presented lies in the fact that once the districts are drawn, even a small enlargement of a special service district might have the effect of placing the entire city-county council on the special service district council. It is apparent from this that in order to meet the constitutional mandate in that portion of this opinion which follows immediately hereafter, provision will have to be made for limiting eligibility of special service district councilmen so that the composition of these councils will comply with the mandate of this opinion. This is a matter properly left to the state officials and courts.

The remaining issue on the special service district councils relates to Sec. 405 of the Act, which provides:

"The Special Service District Council of any Special Service District shall, with respect to such District have exclusive power by ordinance to approve its budget and make appropriations and tax levies required to be made under applicable law therefor; *and that shall be its sole function.*" [Emphasis added.]

Plaintiffs point out that this section apparently leaves the entire residue of legislative authority over important special service district functions, such as police, fire, redevelopment, and housing, with the combined city-county council. This twenty-nine

member council, under present population estimates, will include only fifteen or sixteen members elected from districts within the special service districts. Four of the councilmen will be elected from the county at large and nine or ten will be elected from districts completely outside the special service districts.

Plaintiffs contend that this constitutes a substantial dilution of the voting rights and political power of those within the special service districts, and in particular of the cognizable, racial minority found to exist in the Center Township Ghetto Area. A political party, or interest group, could conceivably command a majority of the twenty-nine member council with the at-large members, the nine or ten from districts outside the special service districts and by obtaining only one or two from within the district. Such a combination could overrule the vote of a substantial majority of the councilmen actually representing the voters and citizens of the special service districts, including those constituting the cognizable, racial minority.

■ The Court, accordingly, finds that the statutory limitation as stated in Sec. 405 of the Act on the authority of the special service district councils over legislation relating solely to such districts and which will be financed by taxes levied only within such districts, is unconstitutional as a substantial dilution of the voting rights of the citizens in the special service districts. Section 1503 of the Act provides:

"If any provision of this Act or the application thereof to any person or circumstances is invalid, such invalidity shall not affect the other provisions or applications of this Act, which can be given effect without the invalid provision or application, and to this end, the provisions of this Act are declared to be severable."

Severing the last clause of Section 405 would leave a comprehensive workable statute and eliminate the constitutional defect. The residue of legislative authority over special service district functions would then reside with the special service district coun-cil rather than with the twenty-nine member city-county council.

The Supreme Court of Indiana has frequently invoked severability clauses to preserve an otherwise important and valid piece of legislation. See *Welsh, Governor, et al. v. Sells, et al.*, 244 Ind. 423, 192 N.E.2d 753, 193 N.E.2d 359 (1963); *Book v. State Office Building Commission*, 238 Ind. 120, 149 N.E.2d 273 (1958).

However, Section 1503 is a standard severability clause of the type before the Court in the recent voting rights case of *Stout v. Bottorff*, 249 F.Supp. 488, 494 (1965). In that decision the Court relied upon an Indiana Supreme Court decision in *Ettinger v. Studevent*, 219 Ind. 406, 38 N.E.2d 1000 (1942), in finding provisions of the statute then before it unseverable notwithstanding the presence of a severability clause. The central holding in the *Ettinger* case is as follows:

"Where the legislature attempts to do several things one of which is invalid it may be discarded if the remainder of the act is workable and in no way dependent upon the invalid portion. But if that portion is an integral part of the act and its excision changes the manifest intent of the act *by broadening its scope to include subject matter or territory which was not included therein* as enacted, such excision is judicial legislation not statutory construction."

■ It is possible that severing the last clause of Section 405 would be construed as broadening the scope of the Act within the meaning of the *Ettinger* decision. The issue of severability is essentially a question of interpretation of Indiana legislation under the Indiana judicial decisions. Severability is essentially a state question from which this Court should abstain. If the effect of the limiting clause of Section 405 is nullified by the state courts under the *book* case, or by local or state legislative action, then the Act will meet constitutional standards on this point. In any event, at this time there appears to be no reason why the Act cannot by implementation, state court construction, limiting ordinance or

amendment by the time of the first Unigov election be brought to meet federal constitutional standards as pointed out above.

The final contention of the plaintiffs is that the provision for county-wide election of the mayor and for county-wide voter control of the administrative branch of local government constitutes an unconstitutional dilution of their voting rights.

One aspect of the mayoral provisions in that statute which plaintiffs do not complain of but which has been part of the controversy surrounding the case lies in the fact that it is evident that the mayor becomes the chief executive for all governmental functions, including the special service districts, and that the Act grants the mayor considerable powers, including those of appointing departmental heads and board members, and the veto power over legislative actions. Plaintiffs do object to the power of the mayor to appoint the director of Public Safety, which appointment is subject only to confirmation by the twenty-nine member city-county council. The duties and authority of this director are almost completely related to the police and fire special service districts. Plaintiffs also assert that the power of a county-wide elected mayor to require a two-thirds vote to enact legislation on the special service district council by the exercise of his veto also constitutes an unconscionable dilution of the vote of the Ghetto Area.

However, as the defendants have pointed out, the consolidation of the functions of the city and county governments and the centralizing of control of many previously existing governmental entities into a single consolidated executive branch, was a principal purpose of the Act. The defendants contend that such a purpose is not only within the wisdom and discretion of the Legislature but in fact is essential to the creation of a viable and efficient government designed to meet local needs. They point out that if the Court would accept the contrary position it would require a separate mayor or executive for every single local government function whose territorial boundaries differ in any respect from that of another governmental agency.

■ Except as noted hereafter, the Court agrees with the defendants on this issue, and that there is no substantial federal constitutional issue on this point. The Court finds that the provision for a single executive and administrative arm of the consolidated government is a proper legislative development and innovation for local government within the terms of the opinion in *Avery v. Midland County*, cited and quoted above. In reaching this determination the Court is impressed with the fact that the Act does provide for numerous changes in the organization of local government in the area involved.

An example in this respect is found in the new Department of Public Works. Before the enactment of Chapter 173 of the Acts of 1969, at least five entities or officers had varying responsibilities over the related governmental concern of sanitation, storm sewers, drains and flood control. There was a separate governmental entity charged with handling flood control on a county-wide jurisdiction. There was a separate Board of Sanitary Commissioners with responsibilities over sanitary conditions and storm drains with a territorial jurisdiction beyond the city but less than the whole county. There was a County Drainage Board, which, together with the County Surveyor, held considerable authority and responsibility over drainage in areas not within any incorporated city or town. Finally, the Board of Public Works of Indianapolis was delegated certain authority over drainage problems within the city. The governing bodies of the various towns also had a similar function within their units. The Court takes judicial notice that the multitude of statutes, agencies and officials involved made planning and action in the area of the disposition, control and handling of water problems a frustrating task. Chapter 173 of the Acts of 1969 consolidates the functions and responsibilities of these various entities into the single Department of Public Works. It provides for coordination and planning for these related func-

tions on a county-wide basis. Similar consolidations of previously splintered responsibilities are provided for in the Act. It is apparent that the statute, as a whole, is an effort to make needed changes in the area of local government.

As for plaintiffs' assertion that the veto power of the county-wide elected mayor over the legislation of the special service district constitutes an unconscionable dilution of the voting power of the Ghetto, the Court is impressed by the following language in Justice Douglas' opinion in *Dusch v. Davis*, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967), in which the consolidated City of Virginia Beach was upheld as constitutional:

> "As the plan becomes effective, if it then operates to minimize or cancel out the voting strength of racial or political elements of the voting population, it will be time enough to consider whether the system still passes constitutional muster." *Dusch v. Davis, supra,* at 117, 87 S.Ct. at 1557, 18 L.Ed.2d at 660.

■ The feature of the statute relating to the councilmanic power of the special service district councils can be determined to be unconstitutional at this time and before the Act is totally in effect because the voting rights dilution which it would create is predictable and inevitable. This is not so with respect to that feature of the statute which provides that the county-wide elected mayor will have veto powers requiring a two-thirds vote of the special service district councils to enact legislation. No such mayor has been elected or has served in office and the manner in which he might use his veto power can only be a matter of speculation. If, in the future, such veto power has the effect of causing an unconstitutional dilution of the voting power of a legally cognizable group, litigation on this point might become appropriate but absent a showing that the dilution of the voting power of such a group was the outright purpose of the Act as was the case with the statutes involved in *Davis v. Schnell*, 81 F.Supp. 872 (S.D.Ala.1949), and *United States v. Louisiana*, 225 F.Supp. 353 (E.D.

La.1963), there is no present basis for attacking the constitutionality of the mayor's veto power.

Allegations to the effect that the statute here in question did have an illegal purpose were contained in the complaint including a statement that the statute provided for all-white areas of Indianapolis to be annexed into all-white cities excluded from most of the provisions of the Act, and that the fair housing ordinance of Indianapolis was to continue to have application only within the former City of Indianapolis, *i. e.*, "the Fire District." This, the complaint charged, would inevitably lead to such annexation of all-white areas within the Fire District with the ultimate result being the creation of three large all-white cities and a Ghetto city. This feature of the statute has been eliminated from a practical standpoint by the enactment of a county-wide fair housing ordinance as one of the first acts of the new city-county council which has recently convened. This, the plaintiffs concede, effectively rebuts their allegations as to the purpose of the Act and constitutes a real step towards the resolution of the problem which is the cause of all Fifteenth Amendment districting cases as was noted in the closing sentence of the first footnote to this opinion.

■ The exception to the foregoing is acceptance by the Court of the plaintiffs' objection to the manner of appointment of the Director of the Department of Public Safety, whose authority and responsibility relate primarily to the police and fire special service districts functions, and relate very much to the substantive political interests of the Ghetto Area as was shown by the evidence in the *Chavis* case and as is demonstrated generally by the Kerner Report, which also took sharp notice of the substantive question at issue in this cause:

> "It is plain that the Negro ghetto resident feels that he is not represented fairly and adequately under the arrangements which prevail in many cities. This condition strikes at major democratic values. To meet this problem, city government and the majority community should

revitalize the political system to encourage fuller participation by all segments of the community." *U. S. Riot Commission Report*, Bantam, p. 296.

The residents of the districts should have more control over the selection of the person who will be appointed to this position. This Court does not believe, however, that it is necessary to discard the statute's basic administrative structure including the authority of the mayor to nominate the individual for this position. It is the opinion of the Court that the issue can be resolved, and the residents of the special service districts given a proper voice in this matter, if the person nominated is subject to confirmation by the police and fire special service district councils rather than by the combined city-county council. Implementation of this should be properly left to the defendants.

The Court will retain jurisdiction in this cause until the constitutional defects noted herein are resolved. Accordingly, no final judgment shall be entered at this time.