566 F.2d 30
 Paul CANTWELL, Glen Howard and Rozelle Boyd, Plaintiffs-Appellees,
v.
William H. HUDNUT, III, Mayor of Indianapolis, Joyce
Brinkman, George Tintera, Alan Kimbell and Paula
Hart, Members of the Indianapolis-Marion
County City-County Council,
Defendants-Appellants.
Paul CANTWELL, Glen Howard and Rozelle Boyd,
Plaintiffs-Cross-Appellants,
v.
William H. HUDNUT, III, Mayor of Indianapolis, Joyce
Brinkman, George Tintera, Alan Kimbell and Paula
Hart, Members of the Indianapolis-Marion
County City-County Council,
Defendants-Cross-Appellees.
 Nos. 76-2076, 76-2077.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 15, 1977.
Decided Dec. 2, 1977.
 
 Harry T. Ice, Indianapolis, Ind., for defendants-appellants.
 Edward O. Delaney, Theodore R. Boehm, Indianapolis, Ind., for plaintiffs-appellees.
 Before FAIRCHILD, Chief Judge, and TONE and WOOD, Circuit Judges.
 TONE, Circuit Judge.
 
 
 1
 Indiana's Uni-Gov statute,[1] unifying the local governments of Indianapolis and Marion County, is challenged in this action as denying certain voters the equal protection guaranteed by the Fourteenth Amendment. The specific statutory provisions under attack allow four city-county councilmen elected at large from the entire Uni-Gov area (a) to sit on the councils of special police and fire districts, the territory of which consists of only part of the Uni-Gov area, (b) to vote at Uni-Gov council meetings on the business of those special districts, and (c) to vote on the issue of the confirmation of the Uni-Gov Director of Public Safety, who is appointed by the Mayor-Chief Executive subject to confirmation by the city-county council and whose principal duties related to the special service districts. The District Court held that (a) and (b) but not (c) denied equal protection to the plaintiffs, who are voters of the special service districts. 419 F.Supp. 1301 (S.D.Ind.1976). We hold all three provisions valid and therefore reverse in part and affirm in part.
 
 I.
 
 2
 The Uni-Gov statute consolidates the local governments of the City of Indianapolis and surrounding Marion County. The statute creates special police and fire service districts, each of which consists essentially of the area of the old City of Indianapolis, but leaves police and fire services in certain cities in the county which are excluded from the new consolidated government to the police and fire departments of those cities and in the rest of the county to the sheriff. The city-county government has extensive power over the police and fire special service districts. In the words of the District Court,
 
 
 3
 "The Act as amended ties the special service districts into the county-wide administrative structure. Thus, (1) the Police and Fire Special Service Districts are under the authority of the Department of Public Safety, IC 18-4-12-1 et seq. (2) The same department is responsible for weights and measures, civil defense and the dog pound. IC 18-4-12-2. (3) The mayor appoints a Director of Public Safety subject to approval by a majority of the entire City-County Council. IC 18-4-3-4. (4) The budgets for the districts are prepared by the Director. IC 18-4-12-11 and 18-4-12-37. (5) Upon the approval or modification thereof by the special councils, the budget is subject to a veto by the mayor of the consolidated citycounty (IC 18-4-5-2(c)) who is elected by the voters of the entire county, not just the special service districts (IC 18-4-3-1). (6) Beyond the limited legislative powers of the districts, their legislative affairs are controlled by the entire City-County Council including both the at-large councilmen as well as single-district councilmen from outside the districts." 419 F.Supp. at 1307.
 
 
 4
 The special service districts have their own councils made up of 20 of the 29 city-county councilmen. Those councils have power to levy taxes and make appropriations for the districts and to approve the budgets for the districts, which are prepared by the Director of Public Safety (and which are ultimately subject to veto by the Mayor-Chief Executive of the city-council government).
 
 
 5
 Of the 29 members of the city-county council, one is elected from each of 25 councilmanic districts and four are elected from the county at large.[2] (Ind.Code § 18-4-3-6.) The 25 districts are substantially equal in population[3] and no question is raised concerning their configuration or equality of population among them.
 
 
 6
 The 20 councilmen who serve on each special service district council include the four elected at large, whose participation as members of those councils and in special service district matters before the city-county council is challenged, and 16 others, who are elected from councilmanic districts having at least 60 percent of their populations living within those districts. Nine of these are wholly within. The other seven are partly within and partly without:
 
 
 7
 Councilmanic Residents' Location
 District Within Outside
------------ ---------- ---------
 5 28,666 1,967
 7 28,276 3,248
 8 27,508 1,743
 12 20,096 8,145
 14 25,622 5,849
 17 29,307 1,127
 20 20,545 9,744
 ---------- ---------
 Totals 180,020 31,823
 
 
 8
 Three councilmanic districts are partly within and partly without the special service districts but are not represented on the latter districts' councils, because less than 60 percent of their populations are within the latter districts:
 
 
 9
 Councilmanic Residents' Location
 District Within Outside
------------ ---------- ---------
 3 5,357 26,572
 4 3,572 28,273
 24 5,486 26,202
 ---------- ---------
 Totals 14,415 81,047
 
 
 10
 The 14,415 residents of these three councilmanic districts who reside within the special service districts are represented in the special service district councils only by the councilmen-at-large. The remaining residents of the special service districts are of course represented on the special service district councils both by the councilmen from their own councilmanic districts and by the councilmen-at-large.[4]
 
 II
 
 11
 Litigation concerning the special service districts began shortly after the passage of Uni-Gov in 1969. In Bryant v. Whitcomb, 419 F.Supp. 1290 (S.D.Ind.1970), in which the court rejected a contention that the entire Uni-Gov plan was a form of racial gerrymandering, the composition of the special service district councils was also challenged. At that time the statute was unclear as to whether councilmen elected at large were to sit on the councils:
 
 
 12
 "A 'Special Service District Council' shall be comprised of the members of the City-County Council elected from all those districts which encompass any part of a Special Service District."
 
 
 13
 Id. at 1296-1297. Noting that this provision could be construed to allow councilmen-at-large to sit on the district councils, inasmuch as their constituencies included the residents of the districts, the District Court nevertheless declined to adopt that construction, on the ground that it "would raise serious constitutional issues since approximately forty percent of the voters for such councilmen will reside outside the special service districts." Id. at 1297.
 
 
 14
 The statute also gave the special service district councils "exclusive power by ordinance to approve (their) budget(s) and make appropriations and tax levies required to be made under applicable law therefor; and that shall be (their) sole function." Id. The court noted that this limitation of the district councils' power left "the entire residue of legislative authority over important special service district functions" in the hands of city-county council. It also noted that the projected composition of the city-county council was such that councilmen representing non-district residents could overrule "the vote of a substantial majority of the councilmen actually representing the voters and citizens of the special service districts, including those constituting (a) cognizable, racial minority." Id. at 1298. Because the statutory limitation on the special service district councils' authority allowed representatives elected in part by nonresidents of the districts to vote on matters that concerned the districts alone, the court held that limitation to be an unconstitutional dilution of the voting rights of the districts' residents. Id.
 
 
 15
 The court abstained from ruling on the severability of this provision from the rest of the statutory scheme and withheld further action to allow time for the effect of the limitation found to be invalid to be "nullified by the state courts . . . or by local or legislative action," thus bringing the Act in conformity with "constitutional standards on this point." Id. Shortly thereafter, the city-county council passed an ordinance providing that police and fire district councils could propose ordinances on all legislative matters concerning the districts and that only councilmen representing constituencies within the districts could vote on those proposals when they were brought before the city-county council. On the basis of this ordinance, the court entered judgment for the defendants.
 
 
 16
 In 1971 the Indiana legislature abrogated the ordinance by adopting a variation of the original plan, specifically including on the special service district councils both councilmen-at-large and councilmen elected in councilmanic districts in which more than 60 percent of the population is within the special service districts. The amendment also limited the powers of the special service district councils, as before, to fiscal matters.[5]
 
 
 17
 This action was then filed against the Mayor-Chief Executive of the consolidated city-county government, the four councilmen elected at large, and the seven councilmen from those councilmanic districts with more than 60 percent of their populations within the special service districts. Plaintiffs asserted that their votes as residents of the special service districts were unconstitutionally diluted by the participation of those councilmen as members of the special service district councils, in special district matters before the city-county council, and in the confirmation of the Director of Public Safety, and sought an injunction against such participation. They also sought an injunction "prohibiting defendants from in any way limiting the legislative power of the special service district councils." The seven councilmen from split councilmanic districts were later dismissed out and the contentions as to them abandoned. The case was assigned to the same district judge. Adhering to the position he had announced earlier, he held unconstitutional the statutory provisions allowing the councilmen-at-large to sit on the special service district councils and to vote in the city-county council on special district matters. Id. at 1313. He reached the opposite conclusion, however, on the issue of the confirmation of the Director of Public Safety. See Part V, infra. These rulings are the subject of the appeal and cross appeal.
 
 
 18
 On the issue of the limitations on the powers of the districts, the District Court's judgment granted no relief other than limiting the powers of the councilmen-at-large. It is therefore unnecessary, as plaintiffs correctly state, to rule on the defendants' arguments on this point, which appear to be addressed to contentions made by plaintiffs in the District Court and to some expressions in that court's opinion rather than its judgment. See 419 F.Supp. at 1306, 1309, 1313-1314. No issue relating to the limitations on the powers of the special service districts is before us.
 
 
 19
 Plaintiffs do not contend that the challenged statute dilutes the votes of a racial minority, the earlier claim to that effect in Bryant having been based on Chavis v. Whitcomb, 305 F.Supp. 1364 (S.D.Ind.1969), which was reversed in Whitcomb v. Chavis, 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971).[6] Nor do plaintiffs question the apportionment of the councilmanic districts.
 
 III.
 
 20
 The interests of three groups are involved in the Indiana legislature's allocation of governmental authority with respect to the special service districts: (1) Residents of the six councilmanic districts wholly within the special service districts. (2) Residents of the special service districts living in councilmanic districts which lie partly within and partly without the special service districts. (3) Residents of the county outside the special service districts. The first group does not require further attention at this point, but the other two do.
 
 A.
 
 21
 The four councilmen-at-large are in essentially the same situation, so far as the issues in this case are concerned, as the seven councilmen elected from the split councilmanic districts with more than 60 percent of their populations within the special service districts.[7] A majority of the constituents of each of these councilmen reside inside the special service districts and a minority without.[8] More important for present purposes, if the four councilmen-at-large were excluded from participation in special service district matters, 14,415 of their constituents living in those districts (in split councilmanic districts 3, 4, and 24) would be disenfranchised as to those matters; and if the seven were also excluded from participation in special service district matters, their 180,020 constituents within the districts would likewise be disenfranchised as to those matters. Thus, if these two categories of councilmen could not participate in special service district matters, extensive redistricting would be required in order to afford representation to all persons who live in the special service districts.[9]
 
 B.
 
 22
 The county residents living outside the special service districts comprise about 40 percent of the county's population. Perhaps their most easily identifiable interest arises from the absence of any separate debt capacity in the special service districts: Expenditures on behalf of the districts for facilities and equipment which are not paid from current funds must be financed through obligations payable from taxes collected countywide. Taxpayers who participate in paying for capital expenditures have an interest in how facilities and equipment are used.
 
 
 23
 Other interests of the nonresidents are less direct. Although the districts levy taxes only on property within their boundaries,[10] between 60 and 70 percent of that property, measured in terms of assessed valuation, is owned directly or indirectly by residents of the county who live outside the districts.[11] Because the special service districts contain the seat of the county-city government, places of employment, shopping centers, hospitals, and other public facilities, nonresidents have an interest in police and fire protection within the districts which is of a magnitude lesser than the interest of district residents but greater than that of those who live further away and do not rely on the facilities of the district. Thus, for example, over 70 percent of the county's workers who live outside the districts have their places of employment within them.[12] Accordingly, as a result of the economic and social, as well as political, interrelationships between the districts and the rest of the Uni-Gov territory, all residents of the county share a community of interests in the proper operation of the police and fire districts as well as the city-county government of which they are a part.
 
 IV.
 A.
 
 24
 Although there are no decisions on the point, we shall assume the correctness of the District Court's view that a state law allowing strangers to participate in the vote for representatives to a local legislative body having general governmental powers over a particular territory would offend the equal protection rights of the resident voters in that territory. Our difficulty with applying that proposition here is that it does not fit the facts. Although police and fire protection are certainly general governmental functions, at most it can be said that only part of the power to exercise those functions is delegated to the special service districts; a substantial part of that power is delegated to the county-wide government; and the exercises of the police and fire protection powers within the districts by the county-wide and district governmental units are interrelated and interdependent. Indeed, it is more accurate to say that the Indiana legislature delegated the police and fire protection functions in the districts to the city-county government, which it plainly had the right to do, except for certain fiscal responsibilities, which it elected to delegate to the district councils in order to give the votes of the residents of the districts added weight with respect to the fiscal aspects of the districts' affairs.
 
 
 25
 We know of no requirement that the legislature give the votes of the districts' residents that added weight. If the police and fire functions had been left entirely with the city-county government, the district's residents would have had no grounds for complaint except perhaps, that taxes levied outside the districts should bear a part of the cost of police and fire protection within the districts. Such a claim is not before us. The question then is whether Indiana, having elected to give some added voice to citizens particularly affected by particular governmental functions, must give them autonomy with respect to those functions.
 
 
 26
 An argument similar to that advanced by plaintiffs here was made to the Second Circuit in Clark v. Town of Greenburgh, 436 F.2d 770 (2 Cir. 1971), in which the "town," comparable to the county here, included six incorporated villages and an unincorporated area. The plaintiffs were residents of the unincorporated area, which had only 47 percent of the town's population but was the source of 95 percent of the town's property taxes and received 95 percent of the town's services. They argued that their votes were unconstitutionally diluted when residents of the incorporated villages were allowed to vote in town elections:
 
 
 27
 "They argue that since a state may not dilute their vote by maintaining election districts of unequal population, Reynolds v. Sims, 377 U.S. 533, (84 S.Ct. 1362, 12 L.Ed.2d 506) . . . a state may not dilute their vote by granting the vote to persons having 'no substantial interest in and deriving no substantial benefit from' the Town government." Id. at 772 (quoting from plaintiffs' brief).
 
 
 28
 The Court rejected the plaintiffs' argument, finding the village residents' interest in the town government sufficient, not only to allow, but to compel, the state to accord them the franchise. The Court also said:
 
 
 29
 "That the village residents may have less interest in Town elections than the residents of the unincorporated area does not 'dilute' the votes of the latter group; if anything, their votes are thereby strengthened since the less interested group will be less likely to vote. More fundamentally, voter 'interest' in this sense will always vary from group to group and issue to issue, but this does not 'dilute' the vote of any group in the constitutional sense. It is true that the Supreme Court has intimated that in some specialized instances the 'one-man-one-vote' rationale may not apply, thereby perhaps allowing the exclusion of some class of voters. But this would hardly help these plaintiffs, who rely on the 'one-man-one-vote' analogy for their main constitutional argument." Id. at 772.
 
 
 30
 Cf. also Rutledge v. Louisiana, 330 F.Supp. 336 (W.D.La.1971); see also Glisson v. Mayor and Councilmen of Town of Savannah Beach, 346 F.2d 135, 137 (5th Cir. 1965).
 
 
 31
 The franchise apportionment cases beginning with Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), are as inapplicable here as they were in Clark v. Town of Greenburgh. Plaintiffs here, like the plaintiffs in that case, complain not that other voters have greater participation or that districts are unequally apportioned, see Hadley v. Junior College District, 397 U.S. 50, 56, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), but that other persons are also allowed some participation.
 
 B.
 
 32
 Alternatively, even if we were to view the problem before us as a dilution of plaintiffs' votes rather than simply a delegation of governmental functions within a local government with undisputed power over those functions, we would not find the action of the Indiana legislature violative of equal protection. Although Salyer Land Co. v. Tular Lake Basin Water Storage District, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973), and Associated Enterprises, Inc. v. Toltec Watershed Improvement District, 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675 (1973), involved special purpose political units and on plaintiffs' theory are inapplicable here for that reason, plaintiffs are in reality attempting to apply the principle of those cases in reverse. Those cases permitted the franchise to be limited to the class of voters primarily burdened and benefited by the activity of the political unit. Plaintiffs argue that they and others in their position are the only ones burdened and benefited and therefore only they should have the franchise. Even assuming that this reverse twist on Salyer and Associated Enterprises should be accepted as a principle of constitutional law, its applicability here would depend upon whether the residents of the county outside the districts, whose inclusion in the franchise arguably dilutes the votes of the districts' residents, lack any interests which would justify allowing them some participation in the election of representatives whose responsibilities include special service district affairs. Cf. Lockport v. Citizens for Community Action, 430 U.S. 259, 271, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977).
 
 
 33
 Here those residents have interests both as residents of the city-county area whose government is responsible to a large extent for the performance of the police and fire functions in the districts and as sharers to some extent in the burdens and benefits of that police and fire protection. Indiana was justified in recognizing those interests and at the same time affording representation to nearly 200,000 of the districts' residents who would have no representation whatsoever on the special service district councils if only councilmanic districts wholly within the special service districts sat on those councils. The problem of the appropriate weight to be given the various interests in allocating the franchise is not susceptible of precise mathematical solution.[13] The Supreme Court has recognized the need for flexibility in local government. In Avery v. Midland County, 390 U.S. 474, 485, 88 S.Ct. 1114, 1120-21, 20 L.Ed.2d 45 (1968), the Court said:
 
 
 34
 "This Court is aware of the immense pressures facing units of local government, and of the greatly varying problems with which they must deal. The Constitution does not require that a uniform straitjacket bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems. . . .
 
 
 35
 "The Sailors (Sailors v. Board of Education, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967)) and Dusch (Dusch v. Davis, 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967)) cases demonstrate that the Constitution and this Court are not roadblocks in the path of innovation, experiment, and development among units of local government. We will not bar what Professor Wood has called 'the emergence of a new ideology and structure of public bodies, equipped with new capacities and motivations . . . .' R. Wood, 1400 Governments, at 175 (1961)."[14]
 
 
 36
 The passage in Professor Wood's book referred to by the Court has reference to the need for simplification and unification of metropolitan governmental units, whose balkanized structures prevent planning and social progress in urban areas. This is the kind of problem Indiana has attempted to solve with Uni-Gov.
 
 
 37
 The allocation of the franchise of which plaintiffs complain is a reasonable accommodation of the various interests involved. Uni-Gov is a complex experiment devised to solve difficult problems of local government. It necessarily contains many interdependent parts designed to give recognition to various interests and needs and to serve the community of interests of all the residents of the urban area. Among those interdependent parts are the location of the councilmanic district boundaries, the allocation of responsibilities between the city-county council and the special service district councils, and the assignment of councilmen to the district councils. We find no constitutional bar to the solution Indiana has chosen, inasmuch as that solution was not invidiously discriminatory, cf. Lockport v. Citizens for Community Action, supra, 430 U.S. at 268, 97 S.Ct. 1047, and was rationally related to the furtherance of a legitimate state policy.[15] The injunctive order that would exclude the councilmen-at-large from serving on the special service district councils or participating in matters pertaining to the districts that come before the city-county council is reversed.
 
 V.
 
 38
 The Director of Public Safety is appointed by the Mayor-Chief Executive of Uni-Gov subject to the approval of the city-county council. The Director is responsible for supervising the special service districts, coordinating "the activities of the department (of Public Safety) with the sheriff and the coroner of the county," and the other county-wide responsibilities described above. (Ind. Code § 18-4-12-5.)
 
 
 39
 Plaintiffs argue, in support of their cross appeal, that an unconstitutional dilution of their voting power results from allowing the councilmen-at-large to vote on the confirmation of the Director. The District Court rejected that claim on the authority of Sailors v. Board of Education, supra, 387 U.S. at 108, 87 S.Ct. 1549, because the Director is a nonlegislative officer. We agree, noting that our holding in Part IV, above, would require the same result apart from the principle stated in Sailors.
 
 
 40
 Plaintiffs argue, however, that the District Court erred in not applying the rule of collateral estoppel on this issue, which would have bound defendants by the court's earlier, contrary ruling in Bryant v. Whitcomb, from which defendants did not appeal. The ruling in Bryant on which plaintiffs rely was interlocutory, however. The court entered final judgment in favor of the defendants, not plaintiffs, after a city ordinance had been passed incorporating the court's suggested changes. The interlocutory ruling was not itself appealable, and it was mooted by the subsequent events. We therefore affirm the District Court's judgment insofar as it denies plaintiffs' claim with respect to the confirmation of the Director of Public Safety.
 
 
 41
 REVERSED IN PART, AFFIRMED IN PART.
 
 
 42
 FAIRCHILD, Chief Judge, dissenting in part.
 
 
 43
 The Legislature has placed the residents of the special service districts in at least three different classes for the purpose of selecting the governing bodies for the districts. One class (which I will designate A) consists of residents of councilmanic districts wholly within the coterminous special service districts. Each member of Class A has a voice, equal with every other resident of his councilmanic district, in selecting one member (1/20) of the governing bodies. The voice of a member of Class A in this selection is not subject to any dilution by sharing it with residents of an area outside the special service districts, and thus not having the same interest in its affairs.
 
 
 44
 A member of Class A also has a voice in selecting an additional four members (1/5) of the governing bodies, but he shares this voice with all other residents of Marion County. Although he and his fellow residents of the special service districts comprise 60% of that electorate, it seems clear to me that the 40% who do not reside in the special service districts, and who thus do not have the same interest in its affairs, produce a substantial dilution of the voting power of the residents of the special service districts.
 
 
 45
 The impact of this dilution is dramatically illustrated by the 1975 election returns. In the election for the four councilmen at large, the four candidates who received approximately 58% of the vote in the special service districts were not elected because they lost the other areas of the county by a larger margin than they carried the special service districts. Thus one-fifth of the governing bodies represents a point of view contrary to that of a majority of the voters of the special service districts.
 
 
 46
 A second class of residents of the special service districts (which I will designate B) consists of residents of councilmanic districts partly outside the special service districts, but with 50% of their residents within. Each member of Class B has a voice equal with every other resident of his councilmanic district, in selecting one member (1/20) of the governing bodies. He shares that voice, however, with residents of an area outside the special service districts and thus not having the same interest in its affairs. Because of this dilution, members of Class B have a presumably less effective voice in the election of their respective members of the governing body elected by districts than do members of Class A. A member of Class B also has a voice in selecting the additional four members-at-large. In this respect his voice is equal to that of each member of Class A and C, but subject to the same dilution.
 
 
 47
 A third class of residents of the special service districts (which I will designate C) consists of residents of councilmanic districts partly outside the special service districts, and with less than 50% of their residents within. Although a member of Class C has a voice in selecting one member of the council of Uni-Gov, that member does not sit on the governing bodies of the special service districts. Thus a member of Class C has no voice corresponding to the voice of members of Class A and B in electing a member of the governing bodies from a councilmanic district. A member of Class C does have a voice in selecting the four members-at-large. In this respect his voice is equal to that of each member of Class A and B, but subject to the same dilution.
 
 
 48
 Clearly the system of selection of the governing bodies of the special service districts is fraught with unjustified classification of residents of the districts and inequality of representation. We do not have before us a simple mechanism which could be claimed to afford representation to the overall government in recognition of some relationship it has to the problems and decisions of the special service districts, whatever might be the proper result if that were the case.
 
 
 49
 The three plaintiffs are shown to be residents of the special service districts. The record does not show whether they are members of Class A, B, or C. In the present posture of the case the challenge is directed solely at the participation of the four members-at-large in the governing bodies of the special service districts. If the plaintiffs are all members of Class A, there could well be argument as to their standing to challenge the structure from the point of view of a member of Class B or C.
 
 
 50
 Moreover, one of the problems inherent in the relief granted by the district court, excluding the four councilmen-at-large from the governing bodies of the special service districts, is that it destroys any possible voice on those boards of members of Class C. Arguably affirmance of that relief would be inappropriate because it exacerbates one problem while seemingly correcting another. The various aspects of inequality of the system are so interdependent that if a court is to deal with any, it arguably must deal with all.
 
 
 51
 In any event, since the system denies equal protection in several aspects, I am unable to join in validating the system upon the principle that the council member-at-large device is a recognition and reasonable accommodation of the interests of residents of the overall municipality in the affairs of the special service districts, or a valid response to the need for flexibility in local government.
 
 
 
 [1]
 The Act's formal designation is the "Consolidated First Class Cities and Counties Act," Chapter 173 of the Acts of 1969, Ind. Code §§ 18-4-1-1 to 18-4-15-2 (1971)
 
 
 [2]
 The city-county council replaced a nine-member council elected at large from six councilmanic districts, with each political party entitled to one nominee from each district. At the general election each voter could cast a vote for nine persons, and the nine having the highest number of votes were elected members. (Ind.Code § 18-2-8-1 to 3.)
 
 
 [3]
 Population varies not more than one percent above or below the norm, based on 1970 Census Data
 
 
 [4]
 Regardless of where a councilman or his constituents reside, he, of course, represents all of his constituents, residents as well as non residents of the special service districts. Cf. Dallas County v. Reese, 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975); Dusch v. Davis, 387 U.S. 112, 115-117, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967)
 
 
 [5]
 The amendment provided in pertinent part as follows:
 "A 'special service district council' shall be composed of all the members of the city-county council elected from an electoral district consisting of the entire county, provided sixty per cent (60%) or more of the population in the county is encompassed within the territorial limits of said district. Such council shall also consist of any member of the city-county council elected from a single electoral district . . . with fifty per cent (50%) or more of its population within the territorial limits of said special service district."
 Acts 1971, P.L. 258, § 1, Ind.Code § 18-4-1-2(m).
 "The special service district council of any special service district shall, with respect to such district have exclusive power by ordinance to approve its budget and make appropriations and tax levies required to be made under the provisions of this article (Ind.Code §§ 18-4-1-1 to 18-4-24-25.) No special service district council shall have authority to originate or separately to adopt any other ordinance. However any ordinance adopted by the city-county council relating solely or exclusively to a special service district shall be suspended and of no effect until separately approved and concurred in by a majority of a special service district council when, but only when, the Constitution of the United States or the Constitution of the state of Indiana prohibits such ordinance taking effect without such approval."
 Acts 1971, P.L. 258, § 6, Ind.Code § 18-4-4-5.
 
 
 [6]
 In that case the District Court's order, which the Supreme Court reversed, would have required reapportionment of the state's legislative districts to eliminate Marion County's multi-member district, on the ground that the multi-member device operated to dilute or cancel the voting strength of an identifiable racial group
 
 
 [7]
 Plaintiffs' counsel acknowledged as much in oral argument before us, and, in fact, as we have noted, the original complaint challenged the participation of these seven councilmen. Plaintiffs abandoned that part of their claim, as their counsel explained in oral argument, not because it was based on a different legal theory, but because the remedy it required, redistricting, would unnecessarily complicate and prolong the proceedings
 
 
 [8]
 Over 60 percent of the constituents of the councilmen-at-large are residents of the special service districts, including the 14,415 whose only representation is through the four councilmen-at-large. Defendants point out that if the registered voters who live in the special service districts had turned out in the same proportion as those outside the districts, the political party that won the majority of votes within the districts could have won the four at-large seats, assuming the same proportion of votes for that party if more persons had voted
 
 
 [9]
 A holding with respect to the four will apply to the seven not only theoretically but, in all probability, practically. Nothing will prevent other residents of the nine councilmanic districts that are wholly within the special service districts, or the present plaintiffs if they are so inclined, from bringing an action to declare the participation of the seven unconstitutional. The decision here would be controlling in such a case. In reality, therefore, the seats of eleven of the twenty members of the special service councils are at stake
 
 
 [10]
 The District Court noted:
 "Within Marion County there are 49 tax rates applied to 83 different geographical areas. No property taxes are (or could lawfully be) collected by the special service districts on property located outside these districts." 419 F.Supp. at 1307.
 
 
 [11]
 This figure includes apartment buildings, whose owners presumably pass on the tax costs to their tenants. This passing-on effect dilutes the significance of defendants' assertion that the residents of the districts pay directly only 9.37 percent and 12.6 percent of the taxes to support the districts' budgets. Cf. City of Phoenix v. Kolodziejski, 399 U.S. 204, 210-211, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970)
 
 
 [12]
 This figure is based on an estimate (72.2 percent) by a representative of the Bureau of the Census in a letter to the Mayor-Chief Executive, William H. Hudnut, dated January 19, 1976
 
 
 [13]
 The magnitude of the "dilution" depends on the point of view. Focusing on the four councilmen-at-large, the District Court accepted the plaintiffs' view that it is approximately 40 percent, because that proportion of the constituents of the councilmen-at-large live outside the districts. 419 F.Supp. at 1309. Defendants argue that the correct figure is 8 percent, because the four councilmen-at-large constitute only 20 percent of the membership of the special district councils (40% x 20% = 8%). We think the latter approach is somewhat more realistic. Plaintiffs' approach not only ignores the fact that 60 percent of the constituents of the councilmen-at-large are residents of the special service districts but gives no weight to the ratio of councilmen-at-large to other special service district council members. Thus that approach would show a 40 percent dilution if only one of the 20 special service councilmen were elected at large and the other 19 were elected entirely within the districts. On the other hand, neither approach takes account of the minorities outside the special service districts who vote for the seven councilmen from split councilmanic districts who sit on the special service district councils. Either approach, in our view is of limited value. It is enough to say that Uni-Gov residents outside the special service districts have been given a relatively minor voice in the election of members of the district councils
 
 
 [14]
 The Court goes on to say:
 "Our decision today is only that the Constitution imposes one ground rule for the development of arrangements of local government: a requirement that units with general governmental powers over an entire geographic area not be apportioned among single-member districts of substantially unequal population." 390 U.S. at 485-486, 88 S.Ct. at 1121.
 That ground rule is not violated by the provisions attacked in the case at bar.
 
 
 [15]
 The proper test when the plaintiffs complain of dilution of their votes for local government representatives is not strict scrutiny (as in a case of total denial, Kramer v. Union Free School District No. 15, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969)) but whether the dilution is reasonable in extent and necessary to further a permissible state policy. Mahan v. Howell, 410 U.S. 315, 321-323, 325, 326, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973); Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967)